THE PEOPLE *ex rel.* Julius S. Grinnell, State's Attorney,

*v.*

FRANCIS A. HOFFMAN *et al.*

*Filed at Springfield March 27, 1886.*

1. ELECTIONS—*Election law of 1885—its constitutionality.* The Election law, entitled "An act regulating the holding of elections, and declaring the result thereof, in cities, villages and incorporated towns in this State," approved June 19, 1885, is a valid act, and not in contravention of any constitutional provision.

2. SAME—*whether that act is "local or special," within the inhibition of the constitution.* The act of 1885, relating to elections in cities, villages and incorporated towns, is not a "local or special law" within the meaning of those terms in section 22, article 4, of the constitution. The fact that such law has no operation in a city, village or town until adopted by the voters thereof, will not render it local or special, or make it invalid. A general law may be made to depend upon some contingency as to when it takes effect in a particular locality.

3. SAME—*election commissioners, under act of 1885—by whom to be appointed—vesting the county court with that power—constitutionality.* Section 10, article 5, of the constitution, was not intended to vest in the Governor the selection and appointment of local municipal officers, such as election commissioners. The power to appoint officers of this class is not characterized by the constitution as either a legislative, judicial or executive power, nor is there anything therein expressed which either directly or impliedly prohibits the legislature from authorizing the county court to appoint such commissioners.

4. Section 1, article 2, of the Election law of 1885, for cities, etc., which provides for the creation of a board of election commissioners, consisting of three members, and directs that they be appointed by the county court, is not violative of that provision of the constitution dividing the powers of government into three departments, and prohibiting any one of such departments from exercising powers properly belonging to either of the others. The exercise of the powers and duties named in the section may appropriately be delegated to a judicial tribunal.

5. SAME—*election commissioners and judges of elections, under the act of 1885—whether a political test is provided.* The Election law of 1885, applicable only to cities, etc., in so far as it requires the appointment of at least two of the three commissioners and two of the three judges of election from each of the two leading political parties, does not establish such a political test of office as is repugnant to section 25 of article 5 of the constitution. The direction to select the appointees from the two political parties is only a rule for the guidance of the appointing power, and imposes no act or action upon the appointees. Of the latter no test can be required, except the oath of office prescribed by the constitution.

6. SAME—*registration of voters—power of the legislature—act of 1885—whether an abridgment of the elective franchise.* The State constitution has no prohibition, expressed or implied, against the passage of registry laws, but, on the contrary, by prescribing certain qualifications for voters, contemplates and intends, by necessary implication, that the legislature should provide some mode of ascertaining and determining the existence of those qualifications.

7. The Election law of 1885, relating to cities, in requiring a registry of voters before elections, and closing the same three weeks before election, and not allowing any one to vote whose name does not appear upon the register, and refusing the privilege of proving, on election day, a non-registered person's right to vote, is not such an arbitrary and unreasonable exercise of the power to regulate elections as to be repugnant to section 1, article 7, of the constitution, prescribing the right to vote.

8. It is not an unreasonable regulation to require a person seeking to exercise the elective franchise, to establish his right three weeks before election day, by satisfactory proof.

9. SAME—*whether an election is "free and equal," within the Bill of Rights.* The declaration in the Bill of Rights that all elections must be equal, does not necessarily mean that there must be uniformity of regulation in regard thereto in all parts of the State. Elections are "free" when the voters are subjected to no intimidation or improper influence, and when every voter is allowed to cast his ballot as his own judgment and conscience dictate. They are "equal" when the vote of every elector is equal in its influence upon the result, to the vote of every other elector.

10. Where an election for or against the same candidates, or for or against the same measure, takes place on the same day in two different cities of the State, the fact that in one city the election officers make their returns to the city clerk, while in the other the returns are made to the county clerk, can make no difference in the freedom or equality of the election.

11. STATUTE—*when an act is general, as contradistinguished from "local or special."* Whether a law is general, does not depend upon the number of those within the scope of its operation. It is. not necessary that it shall operate upon every person in the State, but it is sufficient if every person who is brought within the relations and circumstances provided for, is affected thereby. Nor is it necessary that it should be made equally applicable to all parts of the State. It will be sufficient if it extends to all persons doing, or omitting to do, an act within the territorial limits described in the statute.

12. LEGISLATIVE POWER—*its extent and its limitations.* The legislature of a State can do any legislative act not prohibited by the State or Federal constitution. Without and beyond the limitations and restrictions in these instruments, the law-making power of the State is as absolute, omnipotent and uncontrollable as the English Parliament; and when acting within the scope of its authority, the courts have nothing to do with the propriety, wisdom or expediency of its measures.

13. Where the law-making power of the State, in the exercise of a discretion not prohibited by the constitution, has declared that a certain period of time is needed for a certain investigation, it is not the duty or province of the courts to declare that such period is unreasonably long.

APPEAL from the Criminal Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

This was an information in the nature of a *quo warranto,* filed by Julius S. Grinnell, State's attorney of Cook county, against Francis A. Hoffman, Jr., Samuel B. Raymond and Daniel Corkery, in the Criminal Court of Cook county. The following is a copy of the information, except the formal parts, which was filed by leave of court:

"The petitioner, Julius S. Grinnell, State's attorney of Cook county, Illinois, respectfully represents to the said court that Francis A. Hoffman, Jr., Samuel B. Raymond and Daniel Corkery, have usurped and are now unlawfully exercising the office of election commissioners, and of a board of election commissioners in and for the city of Chicago, and *ex-officio* commissioners of election for the incorporated town of Lake, in said county, there not being any law authorizing or establishing any such office, and, claiming and pretending that they are such officers, have taken an oath that (among other things) they will faithfully and honestly discharge the duties of the office of election commissioners for said city, and have proceeded to elect one of their number chairman and one as secretary, and have demanded of the county clerk of said county, and have received from him, all registry books, poll books, tally sheets and ballot-boxes heretofore used, which were in the hands of said clerk, relating to elections and to the holding of elections within said city of Chicago and incorporated town of Lake, in said county, and are proceeding to provide all necessary ballot-boxes, registry and poll books for the registry of voters and the conduct of elections in said city, and to make a general registration of voters for the next city, State, county and town elections, and to divide the said city of Chicago and town of Lake into election precincts, and appoint places of registry and polling places in each precinct, and also to select and choose three electors as judges of election for each of such precincts, confining their selection of such judges to the selection of one judge, at least, from each of the two leading political parties of the State,—that is to say, one from the Democratic and one from the Republican party,—and are insisting and claiming that they are the only persons and officers that can lawfully perform the said acts, and that they do hold the office aforesaid, and have the legal right to exercise the said power and all the powers set forth and specified in a certain act of

the General Assembly, entitled "An act regulating the holding of elections, and declaring the result thereof, in cities, villages and incorporated towns in this State," approved June 19, 1885, which said act was adopted by vote, as therein provided, by the electors of said city of Chicago and town of Lake, at an election held November 3, 1885, but which said act your petitioner alleges is null and void, the same being in violation of the provisions of the constitution of this State.

"And your petitioner further represents that the said Francis A. Hoffman, Jr., Samuel B. Raymond and Daniel Corkery, claiming that they are such commissioners, are about to divide the said city of Chicago into election precincts, and select and choose judges of election therefor, and to cause registration to be made of the voters therein, and do each and all the acts mentioned in said act of the General Assembly at and concerning the election of aldermen to be held in said city, pursuant to the 'Act to provide for the incorporation of cities and villages,' under which said city is incorporated, which election is provided by law to be held on the 6th day of April, A. D. 1886, although the said election is not provided by law to be held for the election of any general officer of said city, but only for one alderman in each of the wards of said city.

"And your petitioner further represents to the court, that by reason of the usurpation and unlawful exercise of said office, as aforesaid, and claim of right to do the acts and things above set forth by the said persons, great confusion, disorder and injury have resulted and will result to the people of said city and town, and the peace and good order of the People of the State of Illinois will be disturbed unless the right and lawfulness of the said persons to fill and exercise said office is speedily determined:

"Therefore your petitioner, as he is by law authorized to do, petitions and prays the court that it grant to him leave of the court to file herein an information in the nature of a

*quo warranto,* in the name of the People of the State of Illinois, to try the right of the said Francis A. Hoffman, Jr., Samuel B. Raymond and Daniel Corkery, to the office aforesaid, and to exercise the powers above set forth, and that process be issued, and such proceedings shall be had as provided by the statute in such cases, and as shall be requisite to determine the right of the said parties in the premises, and to oust them from the said office, and to enforce and maintain the peace and dignity of the People of the State of Illinois."

The defendants filed a plea in substance as follows, omitting the formal parts:   That the General Assembly, in 1885, passed an act entitled "An act regulating the holding of elections, and declaring the result thereof, in cities, villages and incorporated towns in this State," approved June, 1885, and that under the authority conferred by said act they are now performing and exercising the duties, franchises and obligations imposed on the board of election commissioners by said act; refers to the act; avers that on the 12th of August, 1885, over one thousand legal voters of the city of Chicago voting at the last preceding election, presented a petition to the judge of the county court of Cook county, in which the city is located, to submit to a vote of the electors the proposition whether said city and electors thereof should adopt the act; that on August 24, 1885, the county court submitted said proposition at an election held November 3, 1885; that the county judge gave at least sixty days' notice of the election, by publication in one or more newspapers published in Chicago, for at least five times, and that the first publication was sixty days before the day of the election; that an election was held on November 3, 1885; that the votes were canvassed on the sixth day after the election, and the result declared as provided in the act, and thereupon the county court entered an order declaring the number of votes cast for the proposition, 31,984, and against, 14,557; that in fact that number of votes was cast for and against the act; that

the county court, by order, did, on November 9, 1885, declare the act adopted, and on the 12th of November, 1885, the county judge filed a copy of such order in the office of the Secretary of State; that on the 25th of November, 1885, the county court appointed defendants election commissioners, by order entered of record, and designated the term of Francis A. Hoffman, Jr., for one year, Samuel B. Raymond, two years, and Daniel Corkery, three years, in accordance with the requirements of the act, and that they were eligible to such offices; that on the 25th of November, 1885, each filed official bond in the sum of $10,000, with sureties approved by said judge, conditioned as required by the act, and took the oath of office, and afterwards met and organized as a board by electing Francis A. Hoffman, Jr., chairman, and Samuel B. Raymond, secretary; that by reason of the premises they have become duly qualified election commissioners, and to hold said office until their successors shall be duly appointed and qualified; that by virtue of the several proceedings, they and each of them became, and now are, invested with the office of election commissioners for said city of Chicago; averments of the adoption of the same act, at the same time and in the same way, in the town of Lake, and that they entered upon the discharge of the same duties for the town of Lake. This inducement is followed by a traverse of the usurpation charged in the information.

The People filed a general demurrer to this plea, which the court overruled, and judgment was entered for the defendants. An appeal was granted, by consent of the parties, to the Supreme Court for the Central Grand Division.

Mr. H. B. HURD, Mr. GEORGE SCOVILLE, and Mr. ADOLPH MOSES, for the appellants.

Messrs. ROSENTHAL & PENCE, Mr. JAMES W. BEACH, Mr. HENRY O. McDAID, Mr. JAMES H. MILLER, Mr. W. C. GOUDY, and Mr. J. D. ADAIR, for the appellees.

38—116 ILL.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

The question presented by this record is the constitutionality of an act of the legislature of this State, commonly known as the "Election law," approved June 19, 1885, in force July 1, 1885, and entitled "An act regulating the holding of elections, and declaring the result thereof, in cities, villages and incorporated towns in this State." The law may be found in chapter 46 of the Revised Statutes of 1885, at page 550. An extended statement of its provisions here is unnecessary.

It is claimed, that the act in question is such a local or special law, as is prohibited by section 22 of article 4 of the constitution. That section provides, that the General Assembly shall not pass local or special laws for certain specified objects, and among them, for "the opening and conducting of any election, or designating the place of voting." The feature of the act, which is especially insisted upon as showing it to be local and special in its character, is the provision which is made for submitting the question of its adoption to the votes of the electors in any city, village or town. It is charged, that the act was passed for the benefit of the city of Chicago, and that, having been adopted by that city and by the town of Lake, in the county of Cook, but not elsewhere, it is in force only in one locality. It is said, that, inasmuch as it operates solely and exclusively upon the particular city, village or town, which adopts it, and not upon all the cities, villages and towns in the State, it is special and local in its application, and therefore forbidden by the constitution.

Laws, which depend for their operation upon the votes of the people, have sometimes been held to be unconstitutional, as involving a delegation of legislative authority. In this State, however, they have been held to be valid. The case of *The People* v. *Reynolds*, 5 Gilm. 1, decided, that such laws were perfect and complete, when they left the hands of the

legislature, although they might not take effect, until the happening of some future event or contingency, arising from the voluntary act of others. It was there said: "We may well admit, that the legislature can not delegate its general legislative authority. Still it may authorize many things to be done by others, which it might properly do itself." (*The People* v. *Salomon*, 51 Ill. 37 ; *Erlinger* v. *Boneau*, id. 94 ; *Guild* v. *City of Chicago*, 82 id. 472.) In the case of *Home Ins. Co.* v. *Swigert*, 104 Ill. 653, we again said : "Whatever the rule may be in other States, it is well settled in this, as will appear from the cases just cited, that it is competent for the legislature to pass a law, the ultimate operation of which may, by its own terms, be made to depend upon some contingency, as, upon an affirmative vote by the electors of a given district."

But it is contended, that, although statutes, which are passed in reference to other subjects, may be made to depend for their future effect upon the votes of the people, yet such a feature can not be embodied in any law, which has reference to the particular subjects, enumerated in section 22 of article 4 of the constitution. The reason, assigned for this position, is, that the restriction of a law's operation to the cities, villages or towns, which may vote to adopt it, necessarily, and from the nature of things, makes it local and special. A statute, however, may not only be "perfect and complete," according to the ruling in *The People* v. *Reynolds*, but also *general* in its character, even though it does not take effect, until the happening of some future contingency. Corporations are organized every day under "An act concerning corporations" for pecuniary profit, found in the 32d chapter of our Revised Statutes. When this act first became a law, on July 1, 1872, it had nothing whatever to operate upon. Its provisions were suspended, until some corporation was formed to call them into action. When the first company was organized under it, it was in force as to that alone. Upon the

formation of the second, it was only operative as to two com-
panies, and no more. It was none the less a general law,
because the objects, upon which it took effect, came into being
at different times, and not all at once. Hundreds of corpo-
rations, formed in pursuance of its terms, are now doing busi-
ness in the State.

In 1872, the legislature of Illinois passed "An act to pro-
vide for the incorporation of cities and villages." (Rev. Stat.
chap. 24.) The incorporation of cities and villages is one of
the subjects, about which section 22 of article 4 of the con-
stitution forbids the passage of local or special laws. This
act contains all the provisions essential to a complete muni-
cipal code. Moreover, it starts out with an adopting clause.
The first three sections of its first article provide, that "any
city *now existing* in this State" may become incorporated,
provided that upon the petition of one-eighth of its legal
voters, and at an election to be held as therein directed, the
majority of the votes, cast in such city, shall be in favor of
organizing under said act. On July 1, 1872, that act was,
in a certain sense, dormant. Until some city or village
should vote in favor of accepting it, there was nothing for it
to operate upon. When the first city adopted it, its provi-
sions took effect as to the municipal affairs of that city, but of
no other. It was, for the time being, in force in one locality
alone, and not elsewhere. Notwithstanding these features,
we say of it in *Potwin* v. *Johnson*, 108 Ill. 70: "After full
consideration and reconsideration, we are as firmly committed
to the doctrine as we can be to any doctrine, that the act in
relation to cities and villages is a general law, and not local
or special."

If the act for the incorporation of cities and villages is
a general law, in spite of the fact, that, by its terms, it is
restricted, in its operation, to those cities and villages only,
which vote to adopt it, then the Election law, now under con-
sideration, can not be considered local or special, because it

contains a similar restriction. The title of the Election law is general. It is an act for holding elections and declaring their result, not in any particular city, town or village, but in all "cities, villages and incorporated towns in this State." Its terms are general. It provides that the electors, not of one city or of two or three cities, but "of any city now existing in this State, may adopt and become entitled to" its benefits. It furnishes the machinery, not for one election, but "for all elections, general, special, local, municipal, State and county, and all others of every description." If it has not yet been adopted elsewhere than in Chicago and the town of Lake, it is, for the present, only operative upon elections there held. But its terms are such, that it may hereafter be accepted by other cities and towns. "All that is practicable or could have been intended was, that the legislature should, by a general law, provide for" holding elections and declaring their result in cities, towns and villages, "leaving it to those interested to bring them within its operation." *Guild* v. *City, supra; Town of Fox* v. *Town of Kendall,* 97 Ill. 72; *Hundley* v. *Comr's of Lincoln Park,* 67 id. 559. Whether laws are general or not, does not depend upon the number of those within the scope of their operation. They are general, "not because they operate upon every person in the State, for they do not, but because every person, who is brought within the relations and circumstances provided for, is affected by the laws." Nor is it necessary, in order to make a statute general, that "it should be equally applicable to all parts of the State. It is sufficient if it extends to all persons doing or omitting to do an act within the territorial limits described in the statute." (*The People* v. *Wright,* 70 Ill. 388; *The People* v. *Cooper,* 83 id. 585.) This Election law is not local or special because of the limited number of cities, towns and villages, which may have adopted it. It may rather be said of it, that it is general, because of the possibility, that all the cities, towns and villages in the State may accept its provisions, if they choose.

It is to be noted that the "Act to provide for the incorporation of cities and villages" is, in fact, an Election law.  Its fourth article provides for conducting elections and declaring their results in the cities and villages, which adopt it.  It is only in force in cities and villages, which vote in favor of adopting it.  Therefore, the cities and villages, which have adopted it by their votes, have, at the same time, adopted those parts of it, which relate to the conduct of elections.  In a number of decisions, this court has declared the Incorporation act constitutional.  Consequently the decisions, so made, are authority for the position, that, where a law, which provides for conducting elections and declaring their results, is restricted in its operation to the cities, villages and towns, which vote to adopt it, such a law does not thereby violate that part of the constitution, which prohibits the legislature from passing local or special laws for "the opening and conducting of any election, or designating the place of voting."

It is said that the law can not be held to be constitutional, consistently with the views of this court, as expressed in the case of *The People* v. *Cooper*, 83 Ill. 585; but it contains no such feature, as subjected the "City Tax act" to the condemnation of the court in that case.  The City Tax act attempted to confer upon the council of a city the power to assess and collect its taxes, through certain officers named therein, or through certain other and different officers, named in the general Incorporation act.  An option was conferred upon the city council to select either one of two sets of officers for the purpose named.  This was held to be invalid, as "establishing dissimilarity in the powers and modes of different cities in the levy and collection of taxes."  The case of *The People* v. *Cooper* and the case at bar would be alike, if the Election law had left it optional with any city, town or village, which should adopt it, either to pursue the method of conducting elections, provided for in the act, or to pursue the old method of conducting them, provided for in the general

Election law of the State. It does not, however, permit any such option. We are of opinion, that it is not a local or special law, within the meaning of those terms, as used in section 22 of article 4 of the constitution.

It is said that the law is in conflict with that clause in the Bill of Rights, which provides, that "all elections shall be free and equal." (Const. art. 2, sec. 18.) In order to support this position, it is assumed that the word "equal" means the same as the word "uniform," and it is then argued, that, inasmuch as the cities, towns and villages, which adopt the law, will conduct elections according to *its* provisions, while those, which do not adopt it, will conduct them according to some other and different provisions, therefore, there will be no uniformity, and, by consequence, no freedom or equality. The declaration in the Bill of Rights, that all elections must be equal, does not necessarily mean, that there must be uniformity of regulation, in regard thereto, in all portions of the State. That the definition of "equal elections" does not include and involve the idea of uniformity in regulation, is apparent from the considerations, already presented, upon the question, whether the law is general or special. It being the settled policy of this State, both under the constitutions of 1848 and of 1870, that general laws, whether upon the subject of elections or upon any other subject, may be in force in localities, which vote to accept them, though not in force in localities, which do not vote to accept them, it necessarily follows, that there will be a want of uniformity between the law in force in the adopting locality and the law in force in the non-adopting locality. Elections are free, where the voters are subjected to no intimidation or improper influence, and where every voter is allowed to cast his ballot as his own judgment and conscience dictate. Elections are equal, when the vote of every elector is equal, in its influence upon the result, to the vote of every other elector,—when each ballot is as effective as every other ballot. Where an election for or against the same candidates,

or for or against the same measure, takes place on the same day, in two different cities of the State, the fact that, in one city, the election officers make their returns to the city clerk, while, in the other, the returns are made to the county clerk, can not possibly make any difference in the freedom or equality of the election. Cooley, in his work on Constitutional Limitations, classifies the provisions, which usually occur in bills of rights. He places the declaration, that "all elections shall be free and equal," along with the declaration, that "all freemen are equal," in the first class of such provisions, which he denominates, "those declaratory of the general principles of republican government." (Cooley on Const. Lim. p. 45.) It was never heard of, as a general principle of republican government, that the mode of conducting an election and declaring its result in one city, village or town of a State, shall be exactly the same as the mode pursued for the same purpose in every other city, village or town in the State. This general declaration has reference to the rights of the individual voter,—it does not refer to uniformity of election procedures in different communities. A somewhat similar but more enlarged view of the meaning of the phrase, "all elections shall be free and equal," has been expressed by the Supreme Court of Pennsylvania in *Patterson* v. *Barlow*, 60 Pa. St. 54, and will be referred to in another part of this opinion. The objection, that the law is in conflict with the Bill of Rights, has no force, in the light of these definitions.

The mode of appointing the election commissioners is attacked as unconstitutional. The act provides (art. 2, sec. 1,) for the creation of a board of election commissioners, consisting of three members, and directs, that they shall be appointed by the county court of the county, in which the city, village or town, adopting the law, is located. Article 2 of the constitution of 1848, and article 3 of the constitution of 1870, declare, that the powers of the government shall be divided into three distinct departments, the legislative, executive and judicial,

and that no one of these departments shall exercise any power, properly belonging to either of the others, except as expressly directed or permitted by those instruments. It is urged, that the appointment of the commissioners can not be lodged with the county court, because such appointment involves an exercise of political power, while the functions of the county court are exclusively judicial. The provision, made, for the jurisdiction of county courts, in the present constitution, is very broad. Section 18, of article 6, gives those courts jurisdiction in certain specified matters, "*and such other jurisdiction as may be provided for by general law.*" This grant is liberal enough, on the face of it, to authorize the legislature to extend the jurisdiction of county courts to almost any subject. If, however, the constitutional division of the powers of government into three branches should be construed, as a limitation of this jurisdiction to judicial subjects alone, an examination of the act will show, that many of the duties, to be performed under it, are of a judicial nature. The commissioners consider evidence, and decide whether the judges of election have properly or improperly refused registration. The county court reviews the decision of the commissioners, and in so doing also passes upon the weight of evidence. The exercise of such functions as these is appropriately delegated to a judicial tribunal.

But it is urged, that elections belong to the political branch of the government, and that these commissioners, in so far as they execute and enforce the law in reference to the conduct of elections, are to be considered and treated as political officers. Even if this be so, the power of the judiciary to appoint certain officials, whose duties are not strictly judicial, or even necessarily connected with the business of the courts, has been fully recognized in this State. In *The People* v. *Williams*, 51 Ill. 63, and *The People* v. *Morgan*, 90 id. 558, a statute, which authorized the circuit court of Cook county to appoint assessors and commissioners for the South park,

located in that county, was held to be constitutional. In the latter of these two cases, the point was expressly made, that the circuit judge could not appoint a South park commissioner, on the ground that he was thereby exercising an executive or political function, forbidden by article 2 of the constitution of 1848. The point was, however, overruled, and the power of the court to make the appointment was sustained. It may here be remarked, that the commissioners, under the Park act, are authorized to appoint engineers, surveyors, clerks, and other subordinate officers, including such a police force as may be necessary, as, in the case at bar, the commissioners are authorized to select election judges and clerks.

In *The People* v. *Morgan*, numerous examples are given of official appointments made by the courts, and it is there said: "If it were conceded that these appointments were the exercise of political power, would it necessarily be violative of any provision of the constitution? The division and allotment of the powers are not into political, executive and judicial, but into legislative, executive and judicial. It was, no doubt, the exercise of political power, as that embraces all governmental powers and functions, whether exercised by one department or another, or the officers of one or the other. Political power is the policy of government or its administration, and may be exercised either in the formation or administration of government, or both. Hence it follows, that, if it be a political power, that, of itself, in nowise militates against its exercise by a person, belonging to the judicial department of the government. *  *  * All three departments aid in the administration of government, but perform different functions. The elector, who votes for an officer or measure, exercises political power; yet no one would claim, that, because a judge was a person belonging to the judicial department, he was prohibited from thus voting. We, therefore, conclude, that, if the power to appoint to office is a

political function, this article 2 of the constitution does not prohibit its exercise, because the power is political."

Recent legislation in this State has conferred upon the county courts the power to appoint drainage commissioners, and numerous decisions of this court have sustained the constitutionality of such legislation. *Moore* v. *The People,* 106 Ill. 376; *Blake* v. *The People,* 109 id. 504; *Kilgour* v. *Drainage Commissioners,* 111 id. 342; *Huston* v. *Clark,* 112 id. 344; *Owners of Lands* v. *The People,* 113 id. 296. In *Owners of Lands* v. *The People,* it is said: "Official duties are supposed to be susceptible of classification under the three heads of legislative, executive and judicial, corresponding to the three departments of government bearing the same designations; but the classification can not be very exact, and there are many officers, whose duties can not properly, or, at least, exclusively, be arranged under either of these heads."

Section 2012 of the United States Statutes at large authorizes the circuit courts of the United States to appoint, "as supervisors of election  *  *  *  two citizens, residents of the city or town, or of the election district or voting precinct in the county or parish, who shall be of different political parties, and able to read and write the English language." In *Ex parte Siebold,* 100 U. S. 371, the constitutionality of this section was sustained by the Supreme Court of the United States. The point was there made, that the United States Circuit Courts had not the power to appoint supervisors of election, on the ground that the duties of such courts were judicial, while the supervisors of election were officers, whose duties were executive in their character. It was held, however, that "Congress had the power to vest the appointment of the supervisors in question, in the circuit courts." The court said in that case: "It is, no doubt, usual and proper to vest the appointment of inferior officers in that department of the government, executive or judicial, or in that particular executive department, to which the duties of such

officers appertain. But there is no absolute requirement to this effect in the constitution, and if there were, it would be difficult, in many cases, to determine to which department an office properly belonged."

But the question is not as to the department, to which the election commissioners properly belong, or to which the functions, which they perform, legitimately appertain. The question is, what department, in the absence of an election, can constitutionally confer on them the power to perform their duties. "It is not whether the General Assembly, the executive or the judiciary are the best qualified to select and appoint such officers, but, where is the power to do so lodged." (*The People* v. *Morgan, supra.*) The original power to fill all offices rests with the people. The constitution, in section 10 of article 5, provides for the appointment of certain officers by the Governor. But the reasoning in *The People* v. *Morgan* shows, that it was never intended to vest in the Governor the selection of such local and municipal officers as these commissioners. The power to appoint officers of this class is not specifically designated in the constitution, as either a legislative, judicial or executive power. It is not therein specifically conferred on either department. Nor is there anything therein expressed which, either directly or impliedly, prohibits the legislature from authorizing the county court to appoint the commissioners. Therefore, the authority, conferred on that court to do so, does not make the act invalid. The law-making powers of the States can do any legislative acts, not prohibited by the State constitutions. "Without and beyond these limitations and restrictions, they are as absolute, omnipotent and uncontrollable as Parliament." (*Mason* v. *Wait*, 4 Scam. 127.) One of the counsel for appellant deprecates the policy of placing the selection of election officers in the hands of the courts, and predicts serious evils, as likely to arise therefrom. If the unfortunate results, which he anticipates, were sure to follow, it is not the province of

this court to interfere. Where the legislature is acting within the conceded limits of its constitutional power, that body alone is responsible to the people for the policy, as well as the mode, of exercising such power.

Again, the law is said to be unconstitutional because it establishes a political test, as a qualification for office. It authorizes the county judge to appoint three election commissioners, and provides, that "two of such commissioners, at least, shall always be selected from the two leading political parties of the State, one from each of such parties;" and, in the selection by the commissioners of the three judges of election for each precinct, at least one judge shall be selected from each of the two political parties or organizations of the State. It will be seen, that one of the commissioners and one of the election judges, in each precinct, need not necessarily be a member of either of the leading political parties, but may belong to some third party, or to no party at all. The provision of the constitution, which is said to be violated by the feature of the law, now under consideration, is section 25, of article 5. That section, after directing that "all civil officers," with certain exceptions therein named, "shall, before they enter on the duties of their respective offices, take and subscribe" an oath to support the constitutions of the United States and of Illinois, and to faithfully discharge the duties of the office, etc., then declares as follows: "And no other oath, declaration or *test* shall be required as a qualification."

If the Election law had required either of the commissioners or judges to take an oath as to his political opinions, or that he belonged to one or the other of the leading political parties, there might be some force in the objection, here made. But the law makes no such requirement. The direction to select from the two leading political parties is a rule for the guidance of the appointing officer, and imposes no act or exaction upon the officer appointed. That, which can not be required of the appointee, is, any "other oath, declaration or

test" than the oath set out in section 35. The words "oath, declaration, or test," are almost synonymous terms. They do not refer to the opinions, which a man may be known to entertain, and for which he may be selected to fill a public position,—they are intended to designate the mode, in which a man may be required to give expression to his opinions. If a man is asked to swear to his opinions, an oath is required of him; if he is asked to declare what his opinions are, a declaration is required of him; if he is asked to make an affirmation, as to his opinions, or by word of mouth, or in writing, to state and give utterance to his opinions, in some other way, than by oath or declaration, then a test is required of him. Section 25 requires him to "take and subscribe" the oath there specified. It is then forbidden, that he shall be required to "take and subscribe" any other declaration or test, than the particular oath, whose terms are given.

The word, "test," originally acquired its signification in connection with the word "oath." Every student of history knows, how odious the Test act,—passed in the reign of Charles the Second, and which required a test oath, as a condition to the holding of public office,—became, in the course of time, to the English people. Blackstone states, that the Test act was passed to secure the Established Church of England "against perils from non-conformists of all denominations, infidels, Turks, heretics, sectaries," etc. It directed "all officers, civil and military, to take the *oaths* and make the *declaration* against transubstantiation in any of the king's courts," etc., and also "to receive the sacrament of the Lord's supper, according to the usage of the Church of England, in some public church, immediately after divine service and sermon, and to deliver into court a *certificate* thereof, signed by the minister and church warden, and also to prove the same by two credible witnesses," etc. (4 Blackstone's Com. p. 59.) The framers of our State constitutions understood the word, "test," in the sense, here indicated.

The law states, that the two commissioners to be chosen from the two leading political parties must be men of "well known political convictions." If they are to be men, whose views on political questions have already become known in the communities where they live, before they are selected for the board of election commissioners, it can not be said, that they are required to submit to any political test, to determine what their views are. They are also required to be men of integrity. The county judge can not decide, whether or not they are men of integrity, except from the reputations, which they bear in the city, town or village, where they reside, just as he decides, from their reputations, what their political convictions are. If it can not be said, that, because they are required to be men of integrity, another qualification besides the constitutional oath is exacted of them, as a test for holding office, then, why can it be said, that, because they are required to be men, who are well known to be connected with one or the other of two leading political parties, they are thereby required to submit to some other test than the prescribed oath, before they can be appointed? An election is an expression of the popular will, which necessarily has two sides to it. At every election, there are those, who vote *for* some candidate or measure, and there are those, who vote *against* such candidate or measure. In republican governments, men arrange themselves into these two classes, according to their political views and their party preferences. It strikes the average mind, as being eminently fair, that the votes should be received and counted by men, who represent both sides, rather than by men, who represent one side only.

We have been referred to the case of *Attorney General* v. *Board of Councilmen of City of Detroit*, 58 Mich. 213, where the Supreme Court of Michigan held a different view from that, which is here expressed. But we do not concur in the reasoning of the opinion in that case. In a case in New York, *Barker* v. *The People*, 20 Johns. 457, affirmed in 3 Cow. 686,

the same interpretation was given to the words, now under discussion, as is here announced. Chief Justice Spencer there says: "As to the oath of office prescribed by the sixth article, (of the constitution) and the provision that *no other oath, declaration or test* shall be required, it is contended that the word 'test' has a most extensive meaning, and prohibits the establishing any other rule, by which the capacity of a person to hold an office shall be determined than that defined,— the oath of the person appointed or elected. I can not accede to this. In my judgment *the exclusion of any other oath, declaration or test,* as a qualification for an office or public trust, *means only that no other oath of office shall be required.* &ast; &ast; &ast; The provision, that no other oath is to be required as a test, imports nothing with respect to the other qualifications."

In *Patterson* v. *Barlow*, 60 Pa. St. 54, the Supreme Court of Pennsylvania say, in regard to a similar provision in a registry law of that State: "The law binds the board of aldermen to appoint the officers of the election, so that the political party, having a majority in the election division, shall have a majority of the board. It requires the canvassers to be appointed, so that each party will be represented in the several boards of canvassers, adding a supervising power in the courts to correct errors. What fair mind can pronounce this an abuse of legislative power, so gross, so palpable and so plain as to become an unconstitutional act?"

Section 2012 of the United States Statutes at large, above quoted, and which was held to be constitutional in *Ex parte Siebold, supra,* provides, that the two supervisors of election, to be appointed by the Federal circuit courts, shall be of "different political parties." The validity of this section, though not directly passed upon, was recognized in *In re appointment of Supervisors of Election,* 20 Blatchf. C. C. 13. We are of opinion, that the Election law does not establish any such political test, as is repugnant to the 25th section of article 5 of the constitution.

The next objection to the constitutionality of the law has reference to the provisions, therein made, for the registration of voters. It is claimed, that the regulations· upon this subject are so onerous and unreasonable, as seriously to impede, if not actually to prevent, the exercise by the voter of his constitutional right of suffrage.

The weight of authority in this country is in favor of the power of the legislature to enact registry laws. Such power exists, as well where the constitution is silent upon the subject, as where it expressly enjoins the passage of such an enactment. (Cooley's Const. Lim. *601; *Capen* v. *Foster*, 12 Pick. 485.) In Illinois, the constitution of 1848 made no provision for any action of the legislature, in reference to the registration of electors. While, however, that instrument was in force, and in the year 1865, the legislature passed "An act for the registry of electors and to prevent fraudulent voting." (Pub. Laws 1865, p. 54.) An examination of this act of 1865 will show, that many of its provisions are similar to those of the act, now under review. It is objected to the present law, that it requires the officer to be *"convinced"* of a voter's qualifications. The old law required the officer to be *"satisfied."* It is objected to the present law, that it provides for action, where the officer *"suspects"* a want of qualification. The old law required the administration to a challenged applicant for registration, of the same oath, which, under the election law, then in force, was administered to a challenged voter, if "either of the judges should *suspect* that such person was not a qualified voter." (Gross' Stat. 1871, p. 246.) It is objected to the present law, that it requires the "supporting" affidavit to be on *"knowledge,"* instead of "on belief." The old law required the non-registered voter to prove his residence by the oath of a householder, who should *"know* such person to be an inhabitant of the district,"* etc.

The act of 1865 was decided to be valid, under the constitution of 1848, in the case of *Byler et al.* v. *Asher*, 47 Ill. 101.

39—116 Ill.

It was there held, that the judges of election properly refused to allow a party to vote, whose name was not on the register, and who did not offer to prove, by the oath of a "householder and registered voter," who *knew* him to be such, that he was an inhabitant of the district. In that case the late Justice WALKER said: "There can be no question that the legislature may provide all reasonable safeguards to preserve the ballot-box from fraud, and to maintain the purity of our elections. As the wisdom of our laws, the fair and impartial administration of justice, depends upon the officers chosen by the people, and even the perpetuity of our present form of government can only be maintained by preserving our elections free from fraud and corruption, all reasonable requirements for the purpose, not calculated to abridge the elective franchise, are within the scope of legislative power." It was also held, in that case, that the fact, that the judges were acquainted with the party, not allowed to vote, and knew that he resided in the precinct, and had previously been in the habit of voting there, did not authorize them to dispense with the proof, required by the statute.

The Registry act of 1865 was in force, and the decision in *Byler et al.* v. *Asher,* holding that act to be valid under the constitution of 1848, had been rendered, when the present constitution was adopted in 1870. The latter instrument provided, (section 1 of Schedule,) "that all laws in force at the adoption of this constitution, not inconsistent therewith, * * * shall continue to be as valid, as if this constitution had not been adopted." Nothing can be pointed out in the act of 1865, which is inconsistent with the constitution of 1870. That act, therefore, continued to be as valid under the constitution of 1870, as it had been under the constitution of 1848. It follows, that the present constitution, adopted in 1870, by continuing the validity of the Registry law of 1865, impliedly recognizes the power of the legislature to enact statutes for the registration of voters.

But even if the recognition, here indicated, can not be fairly implied, the power exists independently of any such implication. First, the legislature possesses all the law-making power of the State, which the constitution does not expressly or impliedly prohibit it from exercising. There is no prohibition, either express or implied, in our present constitution, against the passage by the legislature of registry laws. Second, by prescribing certain qualifications for voters, the constitution necessarily intended, that the legislature should provide some mode of ascertaining and determining the existence of those qualifications. A registry law is merely a mode of ascertaining and determining whether or not a man possesses the necessary qualifications of a voter.

The constitution says, (art. 7, sec. 1): "Every person having resided in this State one year, in the county ninety days, and in the election district thirty days next preceding any election therein, * * * who shall be a male citizen of the United States above the age of twenty-one years, shall be entitled to vote at such election." There must be some *tribunal* to decide, whether or not a person is a citizen of the United States over twenty-one years of age, and has resided in the State one year, in the county ninety days, and in the district thirty days. There must be some fixed *rules and regulations*, by which such tribunal is to be guided, in determining this fact of citizenship and these periods of residence. There must be a *statute*, which shall designate the tribunal and prescribe the rules and regulations. The passage of such a statute is the legitimate province of the legislature alone. It being conceded, then, that the power to enact a law for the registration of voters is vested in the legislature, the only question for this court to determine is, whether the particular enactment, now under consideration, is such an arbitrary and unreasonable exercise of the power in question, as to amount to a violation of section 1, of article 7, of the constitution, above quoted. Without commenting upon all the objections made

by counsel for appellant, it is sufficient to say, that the requirements in regard to registration, which are chiefly objected to, are, first, those which concern the mode of ascertaining, who is entitled to be registered; and second, those, which have reference to the time or times, at which registration must take place.

In order to determine who are qualified to vote, the law constitutes the judges of election in each precinct a "board of registry," and provides for an appeal from the board of registry to the board of election commissioners, and from the latter board to the county court. It limits the number of voters in each precinct to three hundred, "as nearly as practicable." The board of registry must sit two full days, from eight o'clock in the morning to nine o'clock in the evening of each day, to hear applications for registration. Applications to be put on the registry list must be made in person. Applicants are examined under oath, touching their qualifications. Where applicants are challenged, or objected to in writing, or suspected of not being qualified after their registry, provision is made for further proofs. The two clerks of election in each precinct are required to act as canvassers, and canvass the precinct, in order to verify the statements of registered parties, as to their places of residence. Copies of the registry lists must be hung up at the places of registration, so that they can be subject to public inspection. No name can be erased from the registry without notice to the party concerned, and where any person is denied registry, or the name of any person is erased after registry, the right of appeal is secured as above stated. Further specification is unnecessary. We see nothing in any of these provisions, which is sufficiently unreasonable to justify us in holding the act invalid. What evidence shall be required to establish a voter's qualification, and how that evidence shall be presented to the body acting upon it, is a matter of discretion with the legislature. This act demands more proof than the act of 1865 demanded, but

it is not, for that reason, unconstitutional. There is no more invasion of the sanctity of home, in permitting an election canvasser to stop at a house and inquire as to the names of the occupants, than there is in allowing an assessor to stop at the same house, for the purpose of making inquiries as to the value of personal property. Inasmuch as the constitution directs, that "the General Assembly shall pass laws excluding from the right of suffrage persons, convicted of infamous crimes," (art. 7, sec. 7,) it can be no invasion of private right to ask an applicant for registry to swear, that he has not been convicted of such crime. In our government sovereignty rests with and emanates from the people. The people express their will through their votes. Hence the casting of a ballot is the exercise of sovereignty. It is not, therefore, unreasonable, that he, who claims for himself this highest of all privileges, should establish his right by satisfactory proof.

But the *time* at which the registration is required to take place, is the feature of the law which is most strenuously attacked. The board of registry in each precinct has its first meeting for receiving applications to be placed on the registry list, on the *fourth* Tuesday, and its second meeting on the *third* Tuesday, before the election. A third meeting is held on the *second* Tuesday prior thereto, but only for the purpose of revising the registry. No new names are added after the *third* Tuesday, and "the vote of no one shall be received by said judges, whose name does not appear upon said registers as a qualified voter." (Article 4, section 229.) It is said, that the legislature has no authority to require, that the registry be closed three weeks before the election; that it has no authority to prohibit a man from voting, because he has not established his qualifications three weeks before the day for voting arrives. It will be noted, that the registry law of 1865 differed from that of 1885, in that the former, although it required the registry board to meet three weeks before the election, yet permitted a party to vote, who was not regis-

tered, if, on the day of election, he proved, by his own affidavit and the oath of a householder and registered voter, that he was entitled to vote. The new law, therefore, makes a radical change in the rule, which has heretofore obtained in this State upon this subject.

If it be admitted, that the legislature can require a voter to establish his qualifications *before election*, it is difficult to see why, upon principle, or as a question of power, it can not require such proof to be made, as well three weeks before the day for voting, as ten days, or five days, or even one day, prior thereto. The real question, involved in the objection, is, whether any man can be prevented from voting, who proves, or offers to prove, on the day, on which he seeks to cast his ballot, that he is a legal voter. If cases can be supposed, where the "three weeks'" requirement will deprive qualified electors of the privilege of depositing their votes, cases can also be supposed, where one day's requirement will work the same result. This mode of reasoning, carried out to its logical sequence, will make any kind of a registry law unconstitutional. For it would be a physical impossibility for the judges of election to receive the votes and make up the registry at the same time and on the same day. If the legislature has the power to direct the registry to be completed before election day, and if, in its wisdom and under a sense of its responsibility to the people, it has said that three weeks before election is a reasonable date for the completion of the registry, shall this court substitute *its* judgment for that of the law-making power, and say that a shorter time would have been more reasonable?

"The moment a court ventures to substitute its own judgment for that of the legislature, in any case where the constitution has vested the legislature with power over the subject, that moment it enters upon a field, where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference. The judiciary can

not run a race of opinions upon points of right, reason and expediency, with the law-making power." Cooley's Const. Lim *168.

In *Prettyman* v. *Supervisors*, 19 Ill. 406, this court said: "If a law is unwise, the legislature is responsible, and it is for their constituents to apply the corrective, and not for the courts, for that reason, to hold it void. We can only look to their power to act under the constitution, and not to the effects of their exercise of constitutional authority, in determining the validity of their acts."

In the late case of *Daggett* v. *Hudson*, 43 Ohio St. 548, the Supreme Court of Ohio, after conceding the power of the legislature to pass a registration law, as well where the constitution is silent, as where it speaks upon the subject, and after further conceding the necessity and desirability of such a measure to protect the purity of the ballot-box, pronounces unconstitutional a statute of that State, which provided for the completion of the registry lists *five* days before election. Neither reason nor authority is so unmistakably on the side of the Ohio decision, as to oblige us to follow it. Cooley, in his work on Constitutional Limitations, *601, and Chief Justice SHAW, in *Capen* v. *Foster*, *supra*, both sustain the validity of statutes "requiring voters to be *registered before the day of election*, and excluding from the right all, whose names do not appear on the list." Just how long before election the voter must be registered, is a matter, about which individuals, and courts, and legislatures, may differ in opinion, but such differences of opinion do not affect the soundness of the principle. In Rhode Island an act, requiring the registry lists to be closed *four* days before election, has been sustained. (*In re Polling Lists*, 13 R. I. 729.) In *The State* v. *Butts*, 31 Kan. 537, the Supreme Court of Kansas, in an able opinion pronounced by Judge BREWER, held, that a statute of that State, which directed the registration to be completed *ten days* before election, was constitutional. A Pennsylvania

law, which provided for closing the registry from seventeen to twenty-three days before election, was held valid in *Patterson* v. *Barlow*, 60 Pa. St. 54. Similar provisions have been upheld in other States. It may be, that as much as three weeks will be required to make such investigations as are necessary to determine the qualifications of the electors. The register must be made, as nearly as possible, a correct record of qualified voters. The names of those, who are not entitled to vote, must be kept from the lists. The names, which may have been placed there by false or perjured testimony, must be erased. Those, whose applications to be registered have been refused, must have an opportunity to appeal to a higher tribunal. Who shall decide just how much time may be needed to accomplish these ends?

All parts of the constitution must be construed together. If there is a provision, that all persons, possessing certain qualifications, shall be entitled to vote, there is also a provision, that all elections shall be free and equal. It is as much the duty of the legislature to pass measures for carrying the latter, as for carrying the former provision, into effect. (Sec. 19 of schedule to constitution.) If closing the registry three weeks before election may deprive a few persons, becoming qualified during that period, of the privilege of casting their ballots, keeping it open until a late date may admit to the polls hundreds of persons, who should never have been allowed to vote. When the ballot-box becomes the receptacle of fraudulent votes, the freedom and equality of elections are destroyed. "That election is free and equal where all of the qualified electors of the precinct are carefully distinguished from the unqualified, and are protected in the right to deposit their ballots in safety, and unprejudiced by fraud. That election is not free and equal where the true electors are not separated from the false,—where the ballot is not deposited in safety, or where it is supplanted by fraud. It is therefore the duty of the legislature to secure freedom and equality by such regu-

lations as will exclude the unqualified, and allow the qualified only to vote." (*Patterson* v. *Barlow,* 60 Pa. St. 54.)   Where the law-making department of the government, in the exercise of a discretion not prohibited by the constitution, has declared that a certain period of time is needed for a specified investigation, it is not the duty of this court to declare, that such period is unreasonably long.   We are of opinion that the article on general and intermediate registration is not repugnant to the constitution.

Many other objections have been made by counsel to the validity of the act, but we have taken notice here, and in *Wetherell* v. *Devine, post,* 631, of all, which we have deemed of sufficient importance to be discussed.   The law was not repealed by another act passed upon the same subject, at the same session of the legislature.

The judgment of the court below is affirmed.

*Judgment affirmed.*


Mr. JUSTICE SCHOLFIELD, dissenting:

I am unable to concur in so much of the foregoing opinion of the majority of the court as holds that the law under consideration is not "local or special," within the meaning of those words as used in section 22, article 4, of our constitution.   That section provides:   "The General Assembly shall not pass local or special laws in any of the following enumerated cases,—that is to say:   *   *   *   The opening and conducting of any election or designating the place of voting. *   *   *   In all other cases where a general law can be made applicable, no special law shall be enacted."   It is, in my opinion, plain, from the ordinary meaning of the words "local or special," that they are here used in contradistinction to the word "general."   (Bouvier's and Webster's Dictionaries, titles "Local," and "Special.")   Within the contemplation of this section, all laws are either general, or local or special. There is no intermediate ground, and this, it seems to me,

is put beyond all doubt by the concluding clause of the section,—"in all other cases where a general law can be made applicable, no special law shall be enacted." And we have accordingly held that under this section there can be enacted, upon the enumerated subjects, none but general laws, (*People ex rel.* v. *Cooper*, 83 Ill. 585,) and this is recognized, by implication at least, in *Guild, Jr.* v. *City of Chicago*, 82 Ill. 472, *Devine* v. *Commissioners*, 84 id. 590, and *People ex rel.* v. *Meech*, 101 id. 200. Laws may be local, and yet in every sense public laws. *Levy* v. *The State*, 6 Ind. 282; *State* v. *Webster et al.* 29 Md. 576; Cooley's Const. Lim. (4th ed.) 482. But such laws are as clearly within the letter and the meaning of this section of the constitution as private local laws.

There has been upon the statute book, since the adoption of the present constitution, a general law regulating the opening and conducting of elections, and the designating of the places of holding elections, and that law, as amended from time to time, all concede, prior to the holding of the elections in the city of Chicago and the town of Lake for the adoption of this law, was in force in every part of the State, and is still in force in every part of it except where it may be superseded by the provisions of this act. Under the general law, the polls must be opened at eight o'clock A. M. and closed at seven o'clock P. M.; under this act, the polls must be opened at six o'clock A. M. and closed at four o'clock P. M. Under the general law, any one possessing the constitutional qualifications for voters, whose name is on the registry list, or whose name not being on the registry list shall be proved by affidavit, in a manner specified, to be entitled to vote, shall be allowed to vote; under this act, no one shall be allowed to vote whose name is not on the registry list twenty-one days before the election. Under the general law the county board fixes the limits of the election precincts, designates the places of voting, and, with certain exceptions, where they are designated by law by virtue of holding certain offices, appoints the

judges of election; by this act, all this is done by election commissioners appointed by the judge of the county court. Under the general law, the offences of illegal voting, bribery, etc., are punishable by fine or imprisonment in the county jail; by this act, these offences are punishable by confinement in the penitentiary. Under the general law, the violation by judges of election of certain prescribed duties is punishable by fine or imprisonment in the county jail; by this act, the same offences are punishable by confinement in the penitentiary.

There are still other matters of dissimilarity between the provisions of the general law and those of this act, equally as marked; but these are sufficient to show that this act is in no sense supplementary to the general law, and that it and the general law are not applicable to different conditions and states of fact, but that they contain radically different systems of law upon the same subject matter.

I concede that a law may be general and yet have practical operation only at rare intervals and in particular localities, by reason of the peculiar subject matter upon which it operates,—as, for instance, a law applying to pilots would be the law in every part of the State, but it could only have practical application on water-courses at points where the vocation of pilot is called into operation. So, also, we have a law upon our statute book imposing penalties upon persons for failing to protect castor beans from stock. In very many of the counties no castor beans are ever raised, and so the law, in practical effect, applies to only a few counties. I also concede that the same general subject matter may be so varied and changed by different combinations of circumstances that a general rule applicable in the one instance can not be applicable in the other, and in such cases a law may be sufficiently general which lays down one rule as applicable to the subject matter under the one combination of circumstances, and another rule as applicable to it as varied and changed

by the different combination of circumstances. And so we
have held that a town under the Township Organization law,
having its limits coëxtensive with the limits of an incorpo-
rated city, is so essentially different, in the subject matter of
township law, from a town having its limits entirely in the
country, that in many respects a different rule ought to be
applied to the one from that applied to the other. But I deny
that where there exists precisely the same subject matter for
a law, and where, in that subject matter, or in the circum-
stances which can practically affect the application and én-
forcement of a law in regard to it, there is nothing to prevent
a single uniform rule, it is competent to adopt and enforce,
as respects the subjects enumerated in this section of the
constitution, one rule in one locality and a different rule in
another locality. I can not believe that a law arbitrarily
classifying the subject matter of a law, and applying and
enforcing different rules in conformity with such arbitrary
classification, is general, or that it can be correctly denomi-
nated otherwise than "local or special." To justify classifi-
cation the difference must be in the thing itself which forms
the subject of legislation, and it must be substantial, and not
simply fanciful. *Hanner* v. *The State ex rel. Richards,* 44
N. J. L. 667.

I assume that it is not questioned, for I do not see how it
reasonably can be, that if the General Assembly had enacted
that this act should apply to the city of Chicago and the town
of Lake only, it would be "local or special," and therefore
obnoxious to this section of the constitution. It is not possible
that there can be any substantial reason why an election should
be opened one hour earlier and closed three hours earlier in
the town of Lake than in any of the other towns of Cook county
outside of the city of Chicago,—why the county board should
define the precincts and appoint the judges of election in
the other towns of Cook county outside the city of Chicago,
and that in that city, and in the town of Lake this must

be done by a board of commissioners appointed by the county judge. It is impossible to state a valid reason why illegal voting and malfeasance in office by judges of election are worse offences in the city of Chicago or the town of Lake, than they are in the village of Hyde Park, or, for that matter, in Peoria, Quincy, Bloomington or Springfield, or in the rural voting districts. But the act does not assume to be based upon any difference in the subject matter of the law, or in the local conditions or circumstances affecting it in different localities. It assumes, on the contrary, the subject matter and the local conditions and circumstances affecting it to be the same in every city, village or town having over five hundred electors; and it is claimed to be general solely because any city, village or town having over five hundred electors may, by popular vote, adopt the act, and thus make its provisions applicable to it. What there is in the rural election districts, and in cities, villages and towns with less than five hundred electors, to distinguish them from the municipalities that are allowed to adopt the provisions of this act, justifying the classification here assumed, I am unable to ascertain.

Although the title of the act indicates an act in force in cities, villages and incorporated towns, no portion of the act is that broad, and the scope of an act can not be enlarged by its title. (Potter's Dwarris, p. 102, and notes.) The first section only assumes to enact "that the electors of any city now existing in this State may adopt and become entitled to the provisions of this act in the manner following." Section 14 reads thus: "Any village or incorporated town in this State may adopt this act in like manner, and the same shall be submitted to a vote of the people of said village or town, upon written application to said county court, of five hundred electors in such village or town." And section 15 reads: "After and from the time of the adoption of this act, as aforesaid, the provisions of the same shall be applicable

to such cities, villages or towns." Section 1 of article 11 then starts off as follows: "In every city, village and incorporated town so adopting this act," etc., and then follow the provisions of the act to be enforced in regard to elections; and so the act itself explicitly declares, without any circumlocution, that it applies and is the law in such cities, villages and towns only, as a majority of the electors wish it to be the law, and so declare at an election held for that purpose, in conformity with the provisions of the act. If valid, its provisions in relation to the opening and conducting of elections are now the law only in the city of Chicago and the town of Lake. Elsewhere those provisions are not the law. In practical effect, as I understand the opinion of the majority here is: Section 22, article 4, of the constitution, has no application to any locality where a majority of the electors desire a special or local law, for if this act is law, then an act upon this subject may be framed to meet the peculiar wishes of a majority in every locality in the State, and, a majority afterwards voting to adopt it, each locality can be governed by a different law in regard to the opening and conducting of elections, and that, too, for the highest as well as the lowest officers to be elected by the electors of the State.

No provision of the constitution ought to be circumvented and its ends defeated by mere matters of form; and this court has solemnly announced, with the acquiescence implied, if not expressed, of every member then constituting the court, that the clauses of section 22, article 4, can not be thus rendered ineffective. *People ex rel.* v. *Cooper et al.* 83 Ill. 585; *Devine* v. *Comrs. of Cook County,* 84 id. 590.

The prohibition of the enactment of local or special laws in section 22, article 4, is absolute—unqualified by any provisos or exceptions. Had it been intended it should have no application where a majority of the electors in any locality should desire to adopt a law applicable to that locality only, is the inference not irresistible it would have been so said

in an exception or proviso at the end of the section? Such a proviso is added to other sections of the constitution. Thus, in section 18, article 4, the State is prohibited from contracting a debt exceeding in the aggregate $250,000, unless the act authorizing the same shall, at a general election, be submitted to the electors of the State and receive a majority vote. By section 33 of the same article, the General Assembly is prohibited from making any appropriation to be expended on account of the new capitol in excess of $3,500,000, without first submitting the proposition for an additional expenditure to the electors of the State at a general election. By section 28 of article 9, county authorities shall never assess taxes the aggregate of which shall exceed seventy cents per $100 valuation, unless authorized by a vote of the electors of the county. By section 2, article 10, questions of dividing counties and removing county seats shall be submitted to votes of electors of the county. By section 1, article 10, questions of adopting or changing from township organization shall be submitted to a vote of the electors of the county. And another section prohibits the sale or lease of the Illinois and Michigan canal, except by a vote of the people. So the question of popular and local option was in the minds of the framers of the constitution, and yet they did not see fit to add it as a qualification, proviso or exception, to section 22, article 4. The maxim that the expression of one thing is the exclusion of another, is held to be as applicable to a written constitution as to a statute. Why does it not apply here?

The fact, however, that we have held that municipal corporations incorporated under special charters may become incorporated under the general Incorporation law, or not, as a majority of the electors of the municipality shall determine, is claimed to be analogous and conclusive on the present question. With due respect to my brethren who so hold, it appears to my mind that this must be a misapprehension, and that the adoption of this act by the electors of a locality, and the

changing from a special charter to the general Incorporation law, are not at all analogous. In the first place, as we have held, the constitution was designed to operate upon legislation *prospectivly,* not *retrospectively.* It did not assume to repeal or invalidate special or local laws in existence at the time of its adoption, but to prohibit the enactment of such laws in the future. Numbers of cities, towns and villages were then incorporated under special charters. These were not. disturbed. But the General Assembly could not thereafter enact special or local laws. It could only enact a general law, under which all cities, etc., thereafter becoming incorporated, and all cities thereafter desiring to change or amend their charters, could become incorporated, or have their charters changed or amended. They could not enact a number of general laws upon the same subject, and allow one city to become incorporated under one, and another city to be incorporated under another, and thus perpetuate the dissimilarities in their charters which it was the object of the constitution to prevent,—and so we held in *People ex rel.* v. *Cooper,* and *Guild* v. *City of Chicago, supra.* When the General Assembly had enacted a single general Incorporation law, it had obeyed the mandate of the constitution. The fact that it did not apply to every municipal corporation was from no defect or optional feature in the law itself, but because it could only operate prospectively, and could therefore only affect corporations thereafter to be created, or whose charters should thereafter be changed or amended; but it did affect and become obligatory, in precisely the same way, upon every municipal corporation thereafter created, or whose charter was thereafter changed or amended. It was not optional with corporations thereafter created whether they should be incorporated under this or some other law. The only option to the electors was, whether they would be incorporated,—not under what law. The law was absolute. The electors might exercise an option to become incorporated, or to change, if already incor-

porated, from their existing charter; but there their option ended. Does anybody pretend that it is optional with a locality to hold a general election or not?—that a majority can disfranchise a minority by the exercise of an option to not hold any elections? The holding of elections is guaranteed to all the voters by the constitution,—they must be held, whether many or few wish to vote at them; and when this constitution was adopted, different localities were not governed by different election laws, so that the General Assembly could, as in the case of cities and villages, only provide a general system for localities to be afterwards brought into being, and those which should wish to change from their existing systems. The city Incorporation law provides for uniformity in the future. This act provides for dissimilarity in the future.

But, in the second place, the adoption of this law in localities has the effect to suspend the general law in relation to elections in those localities. Section 2, article 2, of the constitution, declares that "no person shall be deprived of life, liberty or property, without due process of law." The words, "due process of law," in this connection, are held to be the equivalent of the words, "the law of the land." Cooley's Const. Lim. (5th ed.) 431, 432; Sedgwick on Stat. and Const. Construction, (2d ed.) 474, 475, *et seq.* Mr. Webster, in his argument in the *Dartmouth College case*, 4 Wheat. 519, said: "By the law of the land is most clearly intended the general law. * * * The meaning is, that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." Cooley says: "The legislature may suspend the operation of the general laws of the State; but when it does so, the suspension must be general, and can not be made for individual cases or particular localities." Const. Lim. (4th ed.) 484. Undoubtedly there may be distinctions in regard to classes, or vocations, or localities, but as said in the work last quoted from, on page

40—116 ILL.

486: "Limitations in these respects must rest upon some reason upon which they can be defended, like the want of capacity in infants and insane persons." In *The State* v. *Cooper*, 2 Yerger, 599, the court says: "By 'law of the land' is meant a general and public law, operating equally on every individual in the community." The court then quotes from Lord Coke, (2 Inst. 51,) in which he says that the terms " '*law of the land*,' were used that the law might extend to all." The correctness and importance of this doctrine are recognized and appreciated by all, for no one would pretend that the General Assembly could enact a distinct and different criminal code and a distinct and different civil code, or either, in respect of matters in which every part of the State and every individual therein has a like interest, for the different counties, cities, towns, etc., in the State; and if this could not be done directly, it could not be done indirectly. What would be more absurd than submitting to the different counties, cities or towns the question of whether this or that enactment should be the law in the particular locality in regard to murder, robbery, forgery, perjury, arson, rape, burglary, larceny, etc., or whether, indeed, there should be any law at all in force in the locality in these respects? And yet the reason why this can not be done is simply that persons deprived of life, liberty or property pursuant to such enactments, would be denied the guaranty of "due process of law,"—the enactment would not be "the law of the land."

But a law governing the opening and conducting of general elections is, in reference to a general subject, of like importance and interest in every part of the State, and, presumptively, to every citizen of the State. True, there are local elections,—that is, elections for officers having purely local duties to perform,—and a law in regard to them alone would be in regard to a local subject. But this law is not limited to local elections,—it applies to all elections. It seems to me that it can require no demonstration, because it is self-

evident, that it is no more important to the honest voter in Chicago than it is to the honest voter in Cairo, that at a general election for State officers an illegal vote cast in Chicago be not counted, and that every legal vote cast there be counted as cast. An illegal vote at a general election for State officers, in any part of the State, is a wrong equally to all honest voters in every part of the State. At such an election the illegal vote in Chicago neutralizes or offsets the legal vote cast in Cairo, just as much as it does the legal vote cast in Chicago. And the same observations are equally pertinent. to all elections in the election districts affected by this law, for members of Congress, members of the General Assembly, members of the State Board of Equalization, judge of Supreme Court, judges of circuit, Superior, county and probate courts, clerks of those courts, recorder, county treasurer, sheriff, State's attorney, superintendent of schools, and county commissioners of Cook county. The locality of a wrong upon the ballot-box, is, to the candidate affected by it, and to every honest voter in the particular election district, plainly a matter that can not be of any practical importance. The situation, the circumstances, the rights affecting all voters within the district in which each particular officer is to be selected, must, in the very nature of things, be exactly the same. What can there possibly be, in the circumstances affecting it, to justify the distinction that if an illegal vote be cast or an election officer be guilty of malfeasance in office in one voting precinct in Cook county, the person so guilty shall be punished by confinement in the penitentiary, and yet, if an illegal vote be cast or an election officer be guilty of the same malfeasance in office, under precisely the same conditions and circumstances and in precisely the same way, at an election on the same day for the same officers in another precinct in Cook county, he shall be punished only by fine, or by fine and imprisonment in the county jail?—Or to allow the voter in one precinct to prove by affidavit that he is

entitled to vote, and to deny another voter, at an election for the same officers, on the same day, under precisely the same circumstances, in another precinct, to exercise that right? To my mind it would be no more absurd to discriminate, on account of locality, in regard to murder, larceny, forgery, rape or arson.

Our constitution, in various ways, which need not now be repeated, recognizes the existence of municipal corporations as a part of our system of government, and the municipal corporation thus recognized is one exercising delegated authority to make ordinances and by-laws in regard to local matters. Cooley, in his work on Constitutional Limitations, (4th ed. p. 230,) says: "It has already been seen that the legislature can not delegate its power to make laws; but fundamental as this maxim is, it is so qualified by the customs of our race, and by other maxims which regard local government, that the right of the legislature, in the entire absence of authorization or prohibition to create towns and other inferior municipal organizations, and to confer upon them the powers of local government, and especially of local taxation, and police regulations usual with such corporations, would always pass unchallenged. The legislature, in these cases, is not regarded as delegating its authority, because the regulation of such local affairs as are commonly left to the local boards and officers is not understood to properly belong to the State, and when it interferes, as it sometimes must, to restrain and control the local action, there must be reasons of State policy, or dangers of local abuse, to warrant the interference." See, also, Dillon on Municipal Corporations, (1st ed.) sec. 245. The class of powers, however, which it is competent for the legislature to delegate to municipal corporations, is limited to such as have reference to matters which form appropriate subjects of municipal regulation. The power granted must be one which relates to legitimate and proper municipal purposes. It must be local in its general character, as well as

in its operation.     Freeman's note to *Robinson* v. *Mayor*, 34 Am. Dec. 632.

There are also many cases where acts of an executive character are authorized by legislative enactment, where, from the very nature of the subject, there is an option or discretion vested in an individual,—as, where local ministerial acts are to be performed, and also where there are grants by the public to individuals; but these are hardly to be regarded as laws, within the definition of Blackstone, which he distinguishes from a transient sudden order, from advice or counsel, from contract or agreement, and which he says must have permanency, uniformity and universality.   See 1 Blackstone, (Sharswood's ed.) 44.

Acts for the creation of private corporations, though in the form of statutes, are but legislative grants by the State, constituting, when accepted, contracts, and therefore they are never binding until they are accepted.   Angell & Ames on Corporations, (5th ed.) 381.   See, also, remarks of STORY, Judge, to like effect, in *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 603; *Trustees of Dartmouth College* v. *Woodworth*, 4 Wheat. 518.

In each of the cases cited in the opinion, where a statute submitted to a vote of the people has been sustained, it was either a grant of power to a municipal corporation in regard to a local matter, or a grant of administrative power, or the grant of the right to form a private corporation.   The first and leading case in this court upon the question, (*People* v. *Reynolds*, 5 Gilm. 1,) was upon the validity of a statute providing for the division of Gallatin county and the formation of the county of Saline, in the event that a majority of the electors within the territory should vote in favor of such division,—purely an administrative matter of local concern.   And the court, in sustaining the validity of the act, among other things said:   "We may well admit that the legislature can not delegate its general legislative authority.   *   *   *   Neces-

sarily, regarding many things especially affecting local or individual interests, the legislature may act either mediately or immediately. We see, then, that while the legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet can not understandingly or advantageously do itself. *· * * Local laws almost universally call into action, to a greater or less extent, the agency and discretion either of the people or individuals, to accomplish in detail what is authorized or required in general terms." In *People* v. *Salomon,* 51 Ill. 37, it was submitted to the voters of a prescribed park district whether the act creating such district should be accepted as the law, and the validity of the enactment was sustained on the authority of *People* v. *Reynolds, supra,*—purely a local law. In *Erlinger* v. *Boneau,* 51 Ill. 94, the question was as to the validity of an act prohibiting stock from running at large in the counties of St. Clair and Monroe, and the act was sustained on the authority of *Reynolds* v. *People,* and *People* v. *Salomon, supra.* It was clearly a local and special act, in regard to a matter of purely local government. In *Guild* v. *City of Chicago,* 82 Ill. 473, the controversy was in regard to an amendment to the general Incorporation law for cities and villages, but no question was there submitted to popular vote. In *Home Ins. Co.* v. *Swigert,* 104 Ill. 653, the portion of the opinion supposed to be pertinent is in reference to the 29th section of the Insurance act, imposing upon foreign corporations doing business in this State, like burdens as are imposed upon companies created under the laws of this State doing business in the State creating such foreign corporations. There was no question of option. The law is absolute. The only uncertainty is the measure of liability it imposed on different foreign corporations, and that depends on facts extraneous to the law. In neither of these cases was there any question of the effect of the 22d section of article 4 of the constitution,

upon legislation that but for that section might be submitted to the local option of municipal corporations, and in neither of them was there any question whether a matter belonging to the domain of general law could be submitted for the adoption or rejection of local municipalities.

In brief, I feel compelled to hold that if this law relates to local matters, so as to be within the competency of the General Assembly to delegate its adoption or rejection to the locality to be affected, the law, when adopted, being the law no further than the localities adopting it, must be a local law, and so within the prohibition of the constitution. But I am unable to believe that it is confined to local matters, and so I can not consent to the view that it can be delegated by the General Assembly to the localities to adopt or reject it. If, however, conceding the subject to be general, and that such a delegation is permissible, still, inasmuch as the law, although on a general subject, can have force as an election law only in the localities adopting it, it can not be the law of the land, and it must still be a local law, and so, also, within the prohibition of the constitution.

MULKEY, C. J., and SHOPE, J., concur in the foregoing views.