(No. 21187.
Frank T. Moran *et al.* Appellees, *vs.* William Bowley, County Clerk, *et al.* Appellants.

*Opinion filed January 13, 1932.*

STONE, C. J., and DEYOUNG, J., dissenting.

OSCAR E. CARLSTROM, Attorney General, ALEXANDER J. STROM, State's Attorney, and A. N. TOLLIVER, for appellants.

ROY F. HALL, and WILLIAM R. DUSHER, for appellees.

Mr. JUSTICE JONES delivered the opinion of the court:

This is an appeal from a decree entered by the circuit court of Boone county declaring an act of the General Assembly, sometimes known as the Congressional Apportionment act of 1931, to be unconstitutional and void and enjoining the expenditure of public funds in carrying out its provisions.

The bill of complaint was filed by Frank T. Moran and G. E. Casper against William Bowley, county clerk of Boone county, and William J. Stratton, Secretary of State of Illinois. The complainants represented themselves to be citizens, residents, tax-payers and legal voters of Boone county. The bill was twice amended and in its final form alleged that the Fifty-seventh General Assembly of this State passed the act above referred to, entitled "An act to apportion the State of Illinois into twenty-seven congressional districts, to provide for the election of representatives therein and to repeal an act therein named;" that it was approved by the Governor on July 2, 1931, and that the

act purported to divide the State into districts numbered from 1 to 27, inclusive, each district having a population as here indicated:  1, 269,989; 2, 329,759; 3, 311,814; 4, 232,261; 5, 541,785; 6, 273,679; 7, 311,021; 8, 285,-891; 9, 309,785; 10, 205,074; 11, 322,319; 12, 308,516; 13, 285,499; 14, 211,948; 15, 343,293; 16, 199,104; 17, 158,738; 18, 272,505; 19, 268,656; 20, 229,384; 21, 261,408; 22, 213,154; 23, 276,521; 24, 301,605; 25, 280,854; 26, 227,827; 27, 308,365. The bill as amended alleges that under certain acts of Congress here-after referred to, it was the duty of the legislature of the State of Illinois to divide the State into twenty-seven districts of contiguous and compact territory, containing, as nearly as practicable, an equal number of inhabitants; that the districts created by the act of the General Assembly are unreasonably unequal in population, as before indicated, and in many instances are not composed of contiguous and compact territory, notwithstanding it was reasonably possible and convenient to have made the districts conform to the requirements of the acts of Congress and the constitution of the State of Illinois; that the Secretary of State is about to receive, and will receive, petitions for nomination of candidates for representatives in Congress, presidential electors and delegates to congressional and national conventions from the various districts so constituted, and will thereupon certify the names of such candidates to the different county clerks of the State; that unless restrained by an order of the court the Secretary of State will expend funds now and hereafter in the State treasury for such purposes and other enumerated purposes connected with the elections to be held under said Re-apportionment act; that unless the county clerk of Boone county is restrained he will pay the expenses of the primary election to be held in the spring of 1932 from the county treasury, wherefore money in the hands of the State Treasurer and the county treasurer, to which the complainants have contributed by the payment of

taxes, will be wasted and dissipated. The bill prays that said act of the General Assembly may be declared to be unconstitutional and that the Secretary of State and the county clerk of Boone county may each be enjoined from expending any public funds in carrying out the provisions of the act. Attached to the bill are two maps showing the boundaries of some of the districts. These maps are made a part of the bill by proper reference and exhibit numbers.

The defendants, by their respective attorneys, filed a joint and several demurrer. An amendment to the bill was later filed, after which the above mentioned demurrer was ordered to stand as a demurrer to the bill as amended. Subsequently leave was granted to file a second amendment, and the same was filed, whereupon the demurrer was ordered to stand to the original bill and its first and second amendments. The demurrer was on October 31, 1931, argued by the attorneys for the respective parties. It was overruled and the defendants elected to stand by it. Thereupon a decree was entered declaring said act of the General Assembly to be unconstitutional, the purported congressional districts void, and enjoining the Secretary of State and the county clerk of Boone county as prayed in the bill.

Complainants claim there are two acts of Congress which control the States in the election of representatives to Congress. One of the acts determines the whole number of representatives and apportions that number among the several States. The other is intended to regulate the manner by which the States must elect the representatives so apportioned. The act under which the number of representatives was fixed and apportioned is the act of 1929, known as "Public, No. 13, Seventy-first Congress." It provides for an automatic apportionment of representatives among the several States in the event Congress fails to pass a specific bill therefor at its regular session following each decennial census. The act which it is claimed regulates the manner of electing representatives is known as "Public,

No. 5, Sixty-second Congress." It provides that representatives to the Sixty-third and each subsequent Congress shall be elected by districts composed of contiguous and compact territory, and containing, as nearly as practicable, an equal number of inhabitants; that the districts in each State shall be equal to the number of representatives to which such State shall be entitled in Congress, no district electing more than one representative. The defendants maintain that the act of 1929 repealed the act of 1911; that in the absence of congressional legislation regulating the manner of electing representatives the States are empowered to elect them in any manner they choose, and that they may create districts without regard to contiguity and compactness of territory or equality of population. This contention presents the chief question for decision.

Under the provisions of section 2 of article 1 (as amended by section 2 of article 14) of the constitution of the United States, representatives in Congress shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. The actual enumeration shall be made at stated decennial periods. The number of representatives shall not exceed one for every 30,000 persons, but each State shall have at least one representative. These are the only imperative provisions of the Federal constitution relative to the apportionment of representatives, but section 4 of article 1 provides that "the times, places and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof; but the Congress may, at any time, by law, make or alter such regulations, except as to the places of choosing senators." This provision gives Congress the right of regulation over the election of representatives if it chooses to use it, but if it does not choose to do so the right may be exercised by the several States. Congress must fix the number of representatives to be elected and

apportion that number among the several States according to their respective population, but if it does not enact legislation concerning the times, places and manner of holding the elections, each State is free to elect its full quota of representatives in Congress, at any time and in such manner as it may determine, unless and until Congress enters that field of legislation. When that occurs, the State laws are immediately superseded by the acts of Congress. *Staley* v. *Illinois Central Railroad Co.* 268 Ill. 356; *Henderson* v. *Wickham,* 92 U. S. 259; *Savage* v. *Jones,* 225 id. 501.

For a period of approximately fifty years after the adoption of the Federal constitution Congress was content with fixing the number of representatives and apportioning them among the States. It did so at regular decennial periods, beginning with the year 1792 and extending through the years 1802, 1811, 1822 and 1832. The ratio for the election of representatives in 1792 was one member for every 33,000 persons. The ratio increased by successive stages until 1832, when it was one member for every 47,000 persons. In 1842 (the next decennial period) the ratio was set at 70,680 persons. Congress in that year for the first time exercised its right to legislate under section 4 of article 1, and provided that representatives shall be elected by districts composed of contiguous territory equal in number to the number of representatives to which each State is entitled and that each district shall elect one congressman. This was the first provision for election by districts. The next decennial apportionment, in 1850, fixed the number of representatives at 233 and provided for their apportionment among the States, but it made no provision for election by districts. In 1862 the plan of electing representatives by districts was again invoked, and the Apportionment act provided that the election should be by districts composed of contiguous territory. The next decennial apportionment was in 1872, and not only did the act require members of Congress to be elected by districts

composed of contiguous territory, but it contained the further provision that such districts should contain, as nearly as practicable, an equal number of inhabitants. The same provisions are contained in each decennial Apportionment act from 1872 to and including the act of 1911.

No act was passed to apportion the number of representatives under the census of 1920. This was the first omission in the history of the Republic to comply with the constitutional requirement for a decennial apportionment. The evil arising from this disregard of the constitution is apparent. Each State retained the same number of representatives to which it was entitled under the decennial apportionment of 1911. States which had largely increased in population during the preceding decade were thereby deprived of their proportionate representation in Congress and a consequent advantage was given to the States which had not grown in population.

No further legislation was enacted by Congress relative to apportionments until 1929, unless it can be said that the "Code of the Laws of the United States of America," authorized by an act of Congress December 7, 1925, may be construed as a re-enactment of the essential provisions of the act of 1911. However that may be, the act of 1929 was passed to prevent a recurrence of the omission to reapportion after a decennial census. This fact is deducible from the history of the times. The manifest unfairness resulting from a failure to decennially apportion the number of representatives was a matter of comment in Congress when the act of 1929 was pending. The brief of counsel for complainants sets out in detail many of the remarks of senators and representatives concerning the necessity for a provision of law which would definitely forestall another omission like that which occurred after the 1920 census. While debates of members of the legislative body are not appropriate sources of information to discover the meaning of the language of the statute, nevertheless courts are

at liberty to advert to the view expressed by individual members in debate and gather therefrom the history of the times or of the evil which the legislation was intended to remedy. (*State* v. *Haskell,* 84 Vt. 429, 79 Atl. 852; *Standard Oil Co.* v. *United States,* 221 U. S. 1.) In the *Standard Oil Co. case* Chief Justice White said, that although debates may not be used as a means of interpreting a statute, that rule, in the nature of things, is not violated by resorting to debates as a means of ascertaining the environment at the time of enacting certain laws—*i. e.,* the history of the period when it was adopted. The debates conclusively show that Congress was seeking to enact legislation to remedy the evil which resulted from failure to re-apportion after the 1920 census, by providing an automatic rule to "defeat congressional inertia which has the effect of disfranchising millions of people." The bill undertook to provide a method so that in the event of a failure on the part of Congress to perform its constitutional duty an automatic rule of apportionment would be effective. It is evident from the proceedings of Congress that there was no disposition or intention to repeal the act of 1911 or to abandon the policy of Congress which required representatives to be elected from districts composed of contiguous and compact territory, and containing, as nearly as practicable, an equal number of inhabitants.

While the debates of Congress cannot be resorted to for any purpose except the ascertainment of the history of the times, a different rule obtains concerning reports of committees. Such reports are competent to consider in determining the intention of the legislative body. (*Holy Trinity Church* v. *United States,* 143 U. S. 457; *C. & P. Telephone Co.* v. *Manning,* 186 id. 239.) During the early part of 1929 Mr. Fenn, from the committee on the census, to which Re-apportionment Bill H. R. 11725 had been referred, reported it back with a recommendation that it do pass. According to the report a re-apportionment bill had been

enacted every ten years since 1790 and in every instance was enacted within two years after the taking of the census, and efforts were made in the Sixty-sixth and Sixty-seventh Congresses to enact re-apportionment legislation, but without success. The report stated: "The long-honored tradition, therefore, has been broken for the first time and creates a precedent which is fraught with serious consequences. In fact, the chief purpose of this bill is to prevent a repetition of this situation. * * * The last re-apportionment was made in 1911 on the basis of the 1910 census. This allocated 435 members among the forty-eight States to represent 91,641,197 people. The population in 1920, excluding the District of Columbia, was 105,271,200. Clearly, this indicates that failure to pass a re-apportionment act since 1910 has left 13,631,852 people without fair and equitable representation in Congress. The founders of our government would have been amazed at a situation in which a population three times the population which existed at the time of the adoption of the constitution is denied fair and equitable representation in the House of Representatives. If this dangerous precedent—failure to re-apportion—were repeated in 1930-31, approximately 31,000,000 people would be legislated for without having fair and equitable representation in what is considered the most representative legislative body in the world. To prevent this situation from arising this bill is recommended to the House. * * * The general principle of the bill is simply this: If Congress fails to re-apportion in 1930-31, then automatically the House is re-apportioned in accordance with the tabulation transmitted, * * * the House membership remaining at 435." In a subsequent portion of the report it is said: "This proposed legislation, therefore, is an announcement and serving of notice to the Seventy-first Congress and subsequent Congresses that if they fail to do their duty as provided by the constitution, then the re-apportionment as provided for in this bill will go into effect."

The act of 1929 provided the following means of preventing a recurrence of the evils complained of: On the first day, or within one week thereafter, of the second regular session of the Seventy-first Congress, and of each fifth Congress thereafter, the President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the fifteenth and each subsequent decennial census of the population. The statement shall set forth the number of representatives to which each State would be entitled under an apportionment of the then existing number of representatives among the several States according to the respective numbers of the several States as ascertained under such census, computed by the following methods: (1) "By the method used in the last preceding apportionment;" (2) "by the method known as the method of major fractions;" and (3) "by the method known as the method of equal proportions." In other words, the President is required to submit to Congress at the convening of the session immediately after each decennial census, arithmetical computations showing the number of representatives to which each State would be entitled on the theory that the whole number of representatives in Congress remains the same. The act further provides that if, after the submission of such a statement by the President, Congress shall fail to enact a law apportioning representatives among the several States, then each State shall elect the number of representatives to which it would be entitled according to a computation based on the method used in the last preceding apportionment. It will be observed that congressional inaction will leave the whole number of congressmen unchanged, but if Congress acts it may either increase or reduce such whole number.

The act of 1929 provides for future apportionments in the event of congressional inaction. It makes no provision with reference to the manner of electing representatives.

The law was not intended to regulate the manner and times of electing representatives or to repeal any law which does regulate them, yet it is the contention of defendants that the act of 1929 repealed the act of 1911 and entirely supplanted it, giving to the legislatures of the respective States a free hand in the election of representatives, unrestrained by any act of Congress, and the case of *Minnesota* v. *Holm*, 238 N. W. (Minn.) 494, is cited as an authority for that contention.  It is said that the act of 1911 is in conflict with the act of 1929 and that the latter act contains a clause which repeals all inconsistent acts. and parts of acts.  The act of 1929 differs from prior apportionment acts of Congress.  It has a dual aspect.  The first one deals with the taking of the census in 1930, and sections 1 to 20 provide the regulations and machinery therefor.  Section 21 is the repealing section, and expressly repeals "An act to provide for the fourteenth and subsequent decennial censuses," approved March 3, 1919, and all other laws and parts of laws inconsistent with the provisions of such act.  The act which is specifically repealed by this section related solely to decennial censuses, and had no reference to congressional apportionments or to the regulation of congressional elections.  The twenty sections above mentioned will be searched in vain for anything inconsistent with the Apportionment act of 1911 or with any other apportionment act ever enacted.

The other aspect of the act of 1929 deals with congressional apportionment.  Thus two subject matters are included within the act, namely, census and congressional apportionment.  The provisions of the act which cover the subject of congressional apportionment are contained in the subsequent section 22, which in nowise relates to the taking of a census.  The apportionments contemplated by those sections are based upon the result of census enumerations and are operative only after the censuses have been completed.  We can find nothing in the act of 1929 which

justifies the claim that it repealed the act of 1911, either in express terms or by implication. It is contended that the history, nature and purpose of prior apportionment acts disclose a clear intention on the part of Congress to have each of these apportionment acts replace its immediate predecessor. It cannot be doubted that the policy of Congress, except in 1920, has long been to follow the mandate of the constitution concerning decennial apportionments, and in consequence thereof Congress for more than one hundred years performed that duty with regularity and precision, with a single conspicuous exception. While each decennial act was intended to repeal its predecessor, Congress with conscientious zeal guarded the importance and necessity of regular decennial apportionments by making each act apply not only to the next decennial census but to all subsequent decennial censuses. The conclusion seems irresistible that Congress wanted to make decennial apportionments a certainty and did not intend to release its control over the manner of electing representatives. We cannot bring ourselves to the belief that Congress intended to forsake the field of legislation which it had completely occupied for more than half a century. If the contention is correct that Congress desired to retire from this field laid out for it by section 4 of article 1 of the Federal constitution and without limit turn over to the States the regulations for electing representatives, then it can be argued with equal force that the act of 1875, (Title 2, The Congress, chap. 1, sec. 25,) which fixes the Tuesday next after the first Monday of November of each even-numbered year as the day for election of members to Congress, has also been repealed. We do not think Congress had any such plan in mind.

If the act of 1929 restored to the States all power over the election of congressmen except the fixing of the numbers accorded to them, nothing would prevent some States from electing their congressmen by the people at large and

other States from electing them by districts. Nothing would restrain a State from electing more than one congressman from each district, or, for example, nothing would inhibit the legislature of the State of Illinois from dividing the State into two congressional districts, so that Cook county would be one from which a fixed number of congressmen would be elected and the other district would comprise the rest of the State from which the remainder of the congressmen would be elected. If the legislature is not bound by any law, as defendants claim, it could apportion the whole number of congressmen between the two districts without any regard to population.

The Apportionment act of 1929 was passed pursuant to the provisions of section 2 of article 1 and section 2 of article 14, and the Districting act of 1911 was passed pursuant to the provisions of section 4 of article 1 of the constitution of the United States. There is no conflict between the acts, and there is no reason to be advanced why both cannot remain in full force and effect. In view of the history of the times and the mischief which had been wrought, as well as the plain language of the enactments themselves, we hold that the act of 1929 was not intended to, and did not, repeal the act of 1911. Both acts are essential to the time-honored policies and history of the Federal government, and, inasmuch as the legislature in remapping a State for congressional purposes must be governed by the laws of Congress as they are contained in those acts, it is necessary that their provisions be substantially complied with. Reference to the population of districts heretofore set out will disclose a marked disparity of population among the twenty-seven districts. If the population of the State be divided by 27 the ratio of population for each district is substantially 280,000, yet the population in the several districts varies from 158,738 in the seventeenth district to 541,785 in the fifth district. Such a redistricting gives a voter in the seventeenth district three and

four-tenths times as much weight in electing a congressman as a voter has in the fifth district. Twenty-two out of the twenty-seven districts have fifty per cent more population than the seventeenth district, fourteen districts have seventy-five per cent more population than the seventeenth district, ten have ninety per cent more than the seventeenth district and four have over one hundred per cent more than the seventeenth district. The fifth district is in Cook county. It has approximately one hundred per cent more population than any one of four other districts in the same county. The fifteenth district, with a population of 343,293, adjoins the sixteenth district, with a population of only 199,104. The seventeenth district, with a population of 158,738, adjoins both districts. The fifteenth district is composed of nine counties, while the sixteenth district is composed of six counties and the seventeenth district of five counties. There is no apparent reason why so many counties should have been included in the fifteenth district when some of them could have been attached to either the sixteenth or seventeenth district and thereby answer the requirements of the constitution as to those districts. As it is, the fifteenth district contains 144,189 more persons than the sixteenth district and 184,555 more persons than the seventeenth district. The power of one voter in the sixteenth or seventeenth district in an election of a congressman is double that of a voter in the fifteenth district. The population of the fourteenth district is about 70,000 less than the ratio. The population of the second district is about 50,000 greater than the ratio. This court in *People* v. *Thompson,* 155 Ill. 451, reviewed the Wisconsin case, (*State* v. *Cunningham,* 81 Wis. 440, and 83 id. 90,) also the Michigan case, (*Board of Supervisors* v. *Secretary of State,* 92 Mich. 638,) which held certain re-districting legislation unconstitutional on the ground that there was too great a variation in the population of the districts. In its comment on those cases this court declared that "it would seem plain that in the instances

mentioned in the Wisconsin and Michigan cases there was no approximation toward equality in representation, for where one district contained in the one case more than twice and in the other nearly three times the population of another district, the legislature could not at all, in those instances at least, have regarded the injunction of the constitution to make the apportionment 'according to the number of inhabitants.' "

We have already pointed out several instances in the Illinois law where the provisions for equality of inhabitants were ignored even to a greater degree than in the Wisconsin and Michigan cases. If making some districts two or three times larger in population than some others is sufficiently incongruous to render an act invalid, then there is greater reason to declare void a plan which gives some districts three and four-tenths times as many inhabitants as others. An apportionment cannot be sustained when the result is to give the voter in one district vastly more power than is given to a voter in another district, especially where such an inequality extends to a considerable number of districts. *Donovan* v. *Suffolk County Appor. Comrs.* 224 Mass. 598.

We have no hesitancy in saying that the act of 1911 is in full force and effect so far as it relates to the formation of congressional districts. Still, even if it should be held that the act was repealed by the act of 1929, the Re-districting act of Illinois cannot be sustained. If there were no congressional enactments upon the subject the legislature is powerless to pass laws which effectually tend to disfranchise large numbers of voters. Section 18 of article 2 of the constitution of this State provides that all elections shall be free and equal. An election is free where the voters are exposed to no intimidation or improper influence and where each voter is allowed to cast his ballot as his own conscience. dictates. (*People* v. *Hoffman,* 116 Ill. 587; *People* v. *Emmerson,* 333 id. 606.) Elections are equal when the vote

of each voter is equal in its influence upon the result to the vote of every other elector—where each ballot is as effective as every other ballot. *People* v. *Emmerson, supra; People* v. *Election Comrs.* 221 Ill. 9.

The people of Illinois have by their constitution of 1870 reserved to themselves the ultimate sovereignty to be exercised by means of the ballot. To protect and preserve that sovereignty they declared that all elections shall be free and equal, to the end that each voter will have the privilege of casting his ballot without duress or constraint, and that his vote shall be substantially equal in its influence to that of every other qualified voter. The legislature is not permitted to flagrantly violate this section of the bill of rights and bestow upon classes or sections of voters a greater power and influence in elections than upon other like groups, and, as was said in *Sherman* v. *People,* 210 Ill. 552, the proper and honest conduct of elections is one of the most important functions of government, and the legislature certainly is charged with the duty of enacting such laws as will accomplish this end. Members of the House of Representatives should be chosen by a method giving every voter a voice approximately equal to that of every other voter. Any plan of districting which is not based upon approximate equality of inhabitants will work inequality in right of suffrage and of power in elections of the representatives in Congress. The Re-districting act of 1931 is not only obnoxious to the laws of Congress but to the constitution of this State.

Appellants urge that the bill in this case seeks the protection of political rights, only, and that a court of equity has no authority or jurisdiction over such rights. We have set out in considerable detail the allegations of the bill, and they are sufficient to constitute it a tax-payers' bill to enjoin mis-application and proposed waste of public funds to which the complainants have contributed by the payment of taxes on their property. A similar situation was pre-

sented in *McAlpine* v. *Dimick*, 326 Ill. 240, and it was there held that the relief prayed for by the bill and granted by the decree is not relief of a complainant as an elector but as a tax-payer, and that "equity has always exercised the jurisdiction, at the suit of a tax-payer, to enjoin public officers from the unauthorized appropriation of public funds derived from taxation to purposes not authorized by law. An unconstitutional statute is not law, and an appropriation of public funds in pursuance of an unconstitutional statute is an unlawful appropriation, which will be restrained."

The remaining objection made by defendants is, that this proceeding cannot be maintained because notice was not given pursuant to "An act in relation to suits to restrain and enjoin the disbursement of public moneys by officers of the State." (Cahill's Stat. 1931, chap. 69, pars. 24-30.) This act provides that a suit in equity to enjoin the disbursement of public funds by any officer of the State government may be maintained by the Attorney General or by any citizen and tax-payer of the State, but if the suit is prosecuted by a citizen and tax-payer it shall be commenced by petition for leave to file a bill in equity, which petition shall have attached to it a copy of the bill. The act also provides that upon the filing of such petition it shall be presented to the court if in term time or to a judge thereof in vacation, who shall note thereon the date of presentation, and shall make an order fixing a time, not less than five nor more than ten days thereafter, for a hearing upon the petition for leave to file the bill. Notice in writing shall be given to each defendant and to the Attorney General at least five days before the hearing of such petition. No such notice was given or served upon either of the defendants or upon the Attorney General. However, the necessity of a compliance with the statute was waived by each of them. The defendants filed a joint and several demurrer to the original bill, which was signed by the Attorney General and one of his assistants as attorneys for

the Secretary of State, and by the State's attorney of Boone county as attorney for William Bowley, county clerk of said county. The parties and their attorneys appeared in court without the statutory notice and submitted themselves to the jurisdiction of the court. They did not object that the bill had been filed without any antecedent leave of court. The original bill of complaint was twice amended, and in each instance the defendants and their counsel caused the court to enter an order permitting the demurrer they had theretofore filed to stand as a demurrer to the bill as amended. At no time did any of them interpose an objection on the ground that the bill was filed without notice and without leave. They cannot be heard to raise that objection for the first time on appeal. (*Mulcahey* v. *Strauss,* 151 Ill. 70; *Decker* v. *Stansberry,* 249 id. 487.) The chancellor correctly found that the court had jurisdiction of the parties and the subject matter of the suit.

We find no error in the proceedings, and the decree of the chancellor is therefore affirmed. *Decree affirmed.*

Mr. CHIEF JUSTICE STONE, dissenting:

I am unable to concur in the view of the majority of the court. I am of the opinion the case at bar is outside the jurisdiction of a court of equity as that jurisdiction is defined in this State. It has long been the rule in this State that a court of equity will not interpose in a case affecting only the enjoyment of political rights or assist in the acquisition of such rights. Political rights, though sacred, are properly within the jurisdiction of courts of law. (*Fletcher* v. *Tuttle,* 151 Ill. 41; *People* v. *Thompson,* 155 id. 451; *Harris* v. *Schryock,* 82 id. 119; *Darst* v. *People,* 62 id. 306; *Walton* v. *Develing,* 61 id. 201; *Payne* v. *Emmerson,* 290 id. 490; *Davis* v. *Whitehead,* 86 Okla. 273, 208 Pac. 216; *Shoemaker* v. *DesMoines,* 129 Iowa, 244, 105 N. W. 220.) It is only where civil rights are involved that a court of equity will exercise jurisdiction. In *Fletcher* v. *Tuttle,*

*supra,* this principle is fully presented. In that case combined attacks against the Senatorial Apportionment act of 1893 were attempted in equity. It was there sought to show that civil rights were involved and that the complainant was entitled to an injunction to prevent the expenditure of public moneys to hold an election under that Re-apportionment act. This court there very clearly drew the distinction between judicial power of courts of law and courts of equity as it is recognized in this State. The elementary principle that jurisdiction of a court of chancery in such a case is founded on civil property rights was again announced. In that case the expenditures which the complainant sought, as a tax-payer, to enjoin, were those which it was claimed would arise from certifying and printing on the ballots the names of senatorial candidates. In this case, as in the *Fletcher case,* no attempt is made to restrain the holding of a primary election, and it is, of course, well known that the election will not be confined to the nomination of candidates for Congress but will be a primary for the nomination of many other State, district and county officers. It is not perceived how it is possible to incur additional expense of any moment on this account. The ballots will be printed and the certificates will be made, served and filed whether this act be declared valid or invalid. There can be involved no expenditure of public moneys which a court of equity could restrain, and it is not even contended that equity can take jurisdiction to enjoin the holding of an election. The power to hold an election is political and not judicial, and a court of equity has no jurisdiction to restrain officers from exercising such power. *Harris* v. *Schryock, supra; People* v. *City of Galesburg,* 48 Ill. 485.

The majority opinion is grounded on *McAlpine* v. *Dimick,* 326 Ill. 240. The situations in that case and here do not even approach analogy. The bill there sought to enjoin the county treasurer from paying out money to meet the expense of holding an election under a primary act on the

ground that such act was invalid. It was clear that if the act was invalid the election would be invalid and to pay the cost thereof would be to expend money for an unlawful purpose. In that case equity intervened to protect the rights of the tax-payers in the funds about to be expended for such invalid election. No such situation exists here. There is no charge that any expenditure other than that incurred in holding the lawful primary would arise unless it be the cost of certifying the names of congressional candidates and printing such names on the ballots. Such an expense is so trifling as to defy computation. Pomeroy, in his Equity Jurisprudence, (secs. 1753, 1755,) cited with approval by this court in *Payne* v. *Emmerson, supra,* declares the rule, generally sustained, that equity will not issue an injunction at the relation of a tax-payer to prevent trifling expenditures arising out of an election, for the reason that the injury occasioned thereby is too trifling.

But the argument is made that if this act be declared, in an action at law, to be invalid, or the national House of Representatives refuse to recognize the apportionment made by this act and decline to receive as members of the House of Representatives those elected in accordance therewith, there would then be caused the expense of a special election, and that for this reason equity has jurisdiction. Quite apart from the point developed in the dissenting opinion of my associate, Mr. Justice DeYoung, in which I concur, (that Congress has chosen to remove, by the repealing clause of the act of June 18, 1929, the limitation as to size, compactness and contiguity of congressional districts,) the bill here contains no such ground for relief or averment that such action by the national House of Representatives is threatened. Such a possibility of expenditure of money is too fanciful, chimerical and remote to afford basis for the interposition of a court of equity. To invoke the aid of equity to enjoin payment of the expense of an election it must appear that the officers sought to be enjoined are

threatening to wrongfully expend money and that they will do so but for the intervention of equity. The questions here raised do not involve civil property rights but are purely political, and in my opinion a court of equity does not have jurisdiction.

Mr. JUSTICE DEYOUNG, also dissenting:

The opinion of the majority declares that "An act to apportion the State of Illinois into twenty-seven congressional districts, to provide for the election of representatives therein and to repeal an act therein named," approved July 2, 1931, (Laws of 1931, p. 545) is void for two reasons, first because it contravenes that provision of section 3 of the act for the apportionment of representatives in Congress among the several States under the thirteenth census, approved August 8, 1911, (37 U. S. Stat. at Large, 13, chap. 5), which required congressional districts to be composed of compact and contiguous territory and to contain as nearly as practicable an equal number of inhabitants, and second because it violates section 18 of article 2 of the State constitution which provides that all elections shall be free and equal. Neither of these reasons, it seems to me, is sound, because the Apportionment act of Congress, approved August 8, 1911, is not in force and the State constitutional provision has no application to the subject matter of the act of the General Assembly under review.

The complete title of the act approved August 8, 1911, is "An act for the apportionment of representatives in Congress among the several States under the thirteenth census." (37 U. S. Stat. at Large, 13, chap. 5). Section 3 of the act, which is one of the bases of the opinion of the majority reads: "That in each State entitled under this apportionment to more than one representative, the representatives to the Sixty-third and each subsequent Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable

an equal number of inhabitants. The said districts shall be equal to the number of representatives to which such State may be entitled in Congress, no district electing more than one representative."

The Apportionment act, approved August 8, 1911, was superseded by an act of the Seventy-first Congress, entitled "An act to provide for the fifteenth and subsequent decennial censuses and to provide for apportionment of representatives in Congress," approved June 18, 1929. This act omitted the provision of section 3 of the act of August 8, 1911, that representatives in Congress should "be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants." Section 21 of the act of June 18, 1929, provides that the act entitled "An act to provide for the fourteenth and subsequent decennial censuses, approved March 3, 1919, and all other laws and parts of laws inconsistent with the provisions of this act are hereby repealed."

The act of August 8, 1911, was limited by its title to an apportionment of representatives in Congress "under the thirteenth census." The object of a statute is often limited by its title. Chief Justice Marshall, in *United States* v. *Fisher*, 2 Cranch, 358, 385, said: "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such a case, the title claims a degree of notice, and will have its due share of consideration." The same rule was announced and applied in *Perry County* v. *Jefferson County*, 94 Ill. 214. The provision of section 3 of the act of August 8, 1911, that representatives in Congress should be elected by districts composed of contiguous and compact territory, and contain as nearly as practicable an equal number of inhabitants was by the section itself expressly made applicable only to elections held "under this apportionment." Both the title to and the body of the act disclose in express terms that, by the passage of the act, no apportionment other than the one

under the thirteenth census was in the contemplation of Congress. The thirteenth census was taken in the year 1910, and section 2 of article 1 of the Federal constitution requires such an enumeration to be made every ten years. Five Congresses meet during every such decennial period. The history, nature, purpose and language of the successive apportionment acts disclose a clear intention on the part of Congress to have each act replace its immediate predecessor. The act of August 8, 1911, was designed for a specific purpose and this purpose has been performed. Its provisions, limited by its language to the apportionment under the thirteenth census, have no force or application to an apportionment under the fifteenth census. Moreover, section 21 of the act of June 18, 1929, contains a provision for the repeal of all "laws and parts of laws inconsistent with the provisions of this act." Apart, however, from this express repeal, the life of the act of August 8, 1911, has expired.

Section 4 of article 1 of the Federal constitution provides that "The times, places and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof; but the Congress may, at any time, by law, make or alter such regulations, except as to the places of choosing senators." The power of the State legislature to create and define districts for the election of representatives in Congress is conferred by this section. When the legislature exercises this power, it acts by virtue of a mandate from the people of the United States and not of the State. The Federal constitution and the laws of the United States made in pursance thereof are the supreme law of the land and no provision of a State constitution can prevail against them. In the absence of regulations by Congress, the exercise of the power conferred upon State legislatures by section 4 of article 1 of the Federal constitution is not restricted by requiring the duty to be performed in any particular manner. Emanating from

a superior authority, the particular power is not limited by local constitutional provisions, but is subject only to the paramount authority of Congress, at any time, by law, to "make or alter such regulations." (*Minnesota* v. *Holm,* 238 N. W. 494). Section 18 of article 2 of our State constitution which requires the equality of elections has therefore no application to the act under review and affords no basis for the interposition of a court of equity to set it aside.

The wisdom of requiring compactness of territory and substantial equality of population in the creation of districts for the election of representatives in Congress is dwelt upon in the majority opinion. Whatever courts or judges may think of the propriety, advantage or even necessity of imposing these limitations, the question is one with which they are not concerned, because it is beyond the scope of their power or authority. The wisdom, propriety or expediency of a legislative act is exclusively a question for the lawmaking branch of the government to determine, and a court will not declare a statute invalid because in its judgment the measure may be unwise or detrimental to the best interests of the State. Constitutional limitations afford the only test by which the validity of a statute may be determined. The court's function is to decide the question of power, not of expediency, and a statute will not be declared void simply because, in the court's opinion, it is unwise. By declaring that the limitations of section 3 of the act of August 8, 1911, are still in force and binding upon the General Assembly of this State, notwithstanding the act of June 18, 1929, the majority of the court, I am convinced, enters the domain of Federal legislation and supplies that which the Congress, in its wisdom, deliberately omitted.

For the foregoing reasons, I respectfully dissent from the opinion of the majority and submit that the decree should be reversed and the cause remanded to the circuit court with directions to dismiss the bill for the want. of equity.