133 So.2d 603

Louis W. SCHLEKAU et al.

v.

CITY OF NEW ORLEANS et al.

No. 45848.

Oct. 18, 1961.

Alvin J. Liska, City Atty., Alden W. Muller, First Asst. City Atty., Beuker F. Amann, Joseph H. Hurndon, Gerald P. Fedoroff, Asst. City Attys., New Orleans, for defendants-appellants.

Janet Mary Riley, Patrick M. Schott, New Orleans, for plaintiffs-appellees and intervenors.

FOURNET, Chief Justice.

The City of New Orleans and the Council of the City of New Orleans are appealing from a judgment of the district court maintaining the attack made by petitioners [1] on Ordinance No. 2234 Mayor Council Series—redistricting the City of New Orleans in the light of the 1960 decennial census of the United—as being violative of Article III, Section 3–103(3), of the Home Rule Charter of the City of New Orleans making such redistricting mandatory following the formal promulgation of each decennial census,[2] and restraining and enjoining the City of New Orleans and its Council from taking any action pursuant thereto.

In his written reasons for judgment the trial judge declared the ordinance unconstitutional,[3] being of the opinion that the plan adopted by the Council in Ordinance 2234 M.C.S. showed such a disparity in population between Districts A and B (28,086) as to be contrary to the mandate in Section 3–103(3) of Article III, which requires redistricting in such a manner that the five councilmanic districts will contain, as nearly as possible, the population factor obtained by dividing the city's population by five (125,505), expressing the view that the very language of the Charter is "clear and unequivocal and does not show latitude

1. The petitioners are citizens, taxpayers, and residents of the Fifteenth Ward of New Orleans, in which they were joined by the intervention of the League of Women Voters of New Orleans, an unincorporated Association.

2. The Home Rule Charter of the City of New Orleans was adopted at an election held November 2, 1952, pursuant to the authorization granted in Section 22 of Article XIV of the Constitution of Louisiana, as amended by Act 551 of 1950, and was effective from May 1, 1954. The charter itself was not incorporated in, and therefore forms no part of, the constitution.

3. It is because the trial judge concluded the ordinance under attack was violative of the Home Rule Charter, "which is a constitutional amendment and therefore violates the Constitution of the State of Louisiana," that the matter comes before us by direct appeal under the provisions of Section 10(2) of Article VII of the Constitution of Louisiana. As pointed out in Footnote No. 2, the Home Rule Charter is not itself a part of the constitution.

for such a numerical discrepancy as demonstrated by this record." [4]

The facts of the case disclose that Ordinance No. 2234 M.C.S., was adopted under the mandate contained in the Home Rule Charter of the City of New Orleans making it the duty of the Council to "redistrict the City by ordinance within six months after the official publication by the United States of the population of the City as enumerated by each decennial census. *Each councilmanic district shall contain as nearly as possible the population factor obtained by dividing by five the City's population as shown by the decennial census."* Section 3–103(3) of Article III of the Home Rule Charter. (The emphasis has been supplied.)

In anticipation of such action (although the official report on the census of 1960 was not officially promulgated by the United States government until June 16, 1961), the Council had, by resolution of April 20, 1961, with the appointive power being vested in the Mayor, appointed a Charter Advisory Committee *composed,* in so far as possible, *of the original members of the committee that had drawn up the Home Rule Charter,* requesting such committee, according to the report of that committee, "to study the matter of redistricting the City into five councilmanic districts in accordance with the Home Rule Charter; to conduct such public hearings as may be necessary to ascertain the wishes of the people of New Orleans, and to submit to the City Council as soon as practicable, but not later than June 15, 1961, a specific plan or specific alternate plans for the redistricting of the City."

In its report—submitted on June 14, 1961, and drafted and signed by Mr. Harry McCall, who was chairman and had also been chairman of the original committee drafting the Home Rule Charter—the committee pointed to the necessity for such redistricting (as reflected by the figures set out above in Footnote No. 4), noted the assistance received through the public hearing, meetings with the Mayor and Council,

4. The population growth and shift in the city's five councilmanic districts during the years between effective date of the Charter was so great the following figures disclose the difference which clearly evidenced the imperative necessity for redistricting these municipal subdivisions:

| Population Under Division in Charter | Districts | Population Under 1960 Census |
|---|---|---|
| 111,885 (Wards 13, 14, 16 and 17) | B | 110,613 |
| 113,792 (Wards 1, 10, 11, 12) | C | 103,967 |
| 112,928 (Wards 2, 3, 4, 15) | D | 119,417 |
| 117,820 (Wards 5, 6, 7) | E | 130,165 |
| 114,020 (Wards 8, 9) | A | 163,363 |

representatives of the City Planning Commission, and consultations with members of the staff of the Bureau of Governmental Research. It then pointed out that as a result of such study it was the committee's opinion that

"A. Each district should consist of wards which make up one solid and unbroken parcel with the unavoidable exception that the 15th Ward, being west of the river, cannot, in a technical sense, be contiguous with any other ward.[5]

"B. Each district *must, under the express mandate of the Charter, 'contain as nearly as possible the population factor obtained by dividing by five the City's population as shown by the decennial census.'* This factor is 125,505.

"C. At the present time the integrity of the Wards can and should be preserved. Since the Ward is the smallest governmental unit from which we elect public officials, it would be highly undesirable to create the confusion attendant upon splitting up Wards to redistrict." [6]   (The emphasis has been supplied.)

All of these being considered, the committee recommended the adoption of the following plan,[7] which, it also pointed out, was the only definite suggestion as to redistricting made at the public hearing:

| Councilmanic District | Wards | Population |
|---|---|---|
| A | 14, 15, 16, 17 | 121,015 |
| B | 1, 10, 11, 12, 13 | 128,297 |
| C | 2, 3, 4, 5, 6 | 128,076 |
| D | 7, 8 | 129,932 |
| E | 9 | 120,205 |

The committee, after pointing out the "foregoing represents our considered judgment as *to the best interests of the City as a whole, and gives proper weight to the Charter provision as to the numerical equality between districts,"* stated that because it realized *"there are those who believe the numerical equality of the various districts should be subordinated to certain practical and political considerations,"* suggested, in an attempt to meet these views, the alternative plan adopted by Ordinance 2234 M.C.S., which is as follows: (The emphasis has been added.)

---

5. All of the other wards lie on the east bank of the river.
6. This seems to be true, particularly since it does not appear from the 1960 census municipalities of 10,000 or more have been broken down into smaller units, with the result that it would be practically impossible to determine just which parts of these wards should be changed to secure the ideal factor of 125,505. In this respect we are in full accord with the statement in written brief of ap-

pellants that the splitting of wards to determine this numerical factor would be impracticable at this time since the senatorial and assessorial districts are determined by the ward boundaries as they now exist, and must control in the selection of candidates for these posts in the coming city election scheduled for January 1962.
7. Two members of the committee voiced opposition to the primary plan and one member opposed the alternate plan.

| Councilmanic District | Wards | Population |
|---|---|---|
| A | 13, 14, 16, 17 | 110,613 |
| B | 1, 10, 11, 12, 15 | 138,699 |
| C | 2, 3, 4, 5, 6 | 128,069 |
| D | 7, 8 | 129,932 |
| E | 9 | 120,205 |

It is thus obvious that between District A, the smallest, and District B, the largest, there is a difference in population of 28,086. It is also obvious that between the ideal factor of 125,505, arrived at by dividing the population of the city by five, and the population of District B, there is a difference of 13, 194. An effort to amend the ordinance so that Districts A and B would conform to the primary plan was defeated by a tie vote.

The main defense—urged in the lower court by a plea to the jurisdiction, an exception of no cause of action, and in answer —is that inasmuch as the Council in adopting the ordinance under attack was exercising legislative discretion in a realm purely political in character, the courts have no authority to step in and substitute their judgment for that of the Council unless the results obtained is "so capricious or arbitrary as to be unreasonable," and since the Council, after consideration of all factors involved and every means at its disposal, concluded the plan as set out in the ordinance was the one "best suited for the interest of the city as a whole," it complied with the directive of the Charter, and, fur-

ther, did not so abuse this legislative discretion as to warrant interference by the judiciary. Reliance is placed on the following: Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432; Blocher v. City of New Orleans, La.App., 50 So.2d 498; Walker v. Mansfield Hardwood Lbr. Co., La.App., 35 So.2d 610; and Miller v. City of Chicago, 348 Ill. 34, 180 N.E. 627.

The appellees, on the other hand, contend that regardless of the deliberation given the matter by the council, it is a legitimate function of the courts to review such ordinances to determine whether, under the very language vesting it with such authority its action has been so capricious, arbitrary, and unreasonable as to render the ordinance void, particularly since Section 3–103(3) of the Home Rule Charter lays down as the *only* test by which the Council and the City shall be guided in such redistricting that of "numerical equality between districts," a standard the Council has clearly disregarded in the plan it has adopted, as evidenced by the great disparity of numerical equality between Districts A and B (28,086), which compels the original petitioners, along with all others living in Ward 15 and the other wards making up District B under this ordinance, having a population of 138,699, to be content with the same representation in governmental matters affecting the municipality as that given to the residents of District A, with a population of only 110,613, a difference so

substantial as to not only be in clear violation of the charter's requirements for numerical equality, but also to reflect the capricious, unreasonable, and arbitrary action of the Council in adopting this plan by Ordinance 2234 M.C.S. The authorities on which they rely are: Attorney General v. Suffolk County Apportionment Commissioners, 224 Mass. 598, 113 N.E. 581; Moran v. Bowley, 347 Ill. 148, 179 N.E. 526; State of Wisconsin ex rel. Adams County and S. W. Pierce, District Attorney v. Cunningham, 81 Wis. 440, 51 N.W. 724, 15 L.R. A. 561.

█ It is too fundamental to require citation of authorities that although the judiciary may not substitute its own personal views for the discretion vested in legislative bodies or governmental subdivisions to which such authority has been delegated within the standards set up by the legislative body, it is clearly within the province of the courts to review the action of such legislative bodies for the purpose of determining whether it is valid, legal, and/or constitutional. In fact, this is apparently conceded by counsel representing the appellants since it is stated in brief that courts cannot set aside apportionment or redistricting statutes and ordinances "unless the results obtained by the exercise of sound discretion is so capricious or arbitrary as to be unreasonable." As otherwise expressed in Miller v. City of Chicago, 180 N.E. 627, 629, one of the authorities relied on heavily by

counsel representing the City of New Orleans and its Council, and quoted extensively in brief, "It is only when the result obtained by the exercise of such power [legislative authority for the redistricting of a political subdivision] is so capricious or arbitrary as to be unreasonable that a court can intervene and declare the same invalid." (The phrase within brackets has been added.)

█ After a careful perusal of the record in this case, the authorities relied on, and a serious consideration of this very vital issue to the people of New Orleans, we are constrained to hold that Ordinance No. 2234 M.C.S., adopting the alternative plan suggested by the advisory committee, not only fails to conform with the mandate of the Home Rule Charter with respect to the redistricting in the light of the numerical factor determined by dividing the city's population by five, but results in such an inequality of representation because of the great disparity between the populations of Districts A and B as to be arbitrary, unreasonable, and capricious, resulting in its invalidity, particularly when it appears this division of the population by five was disregarded or given little weight.

During the trial of this case the author of Ordinance 2234 M.C.S. admitted the primary plan submitted by the advisory committee provided for a more nearly equal mathematical distribution of the popula-

tion, and conceded even other plans might come closer to such mathematical equality,[8] but expressed the view this numerical factor should be subordinated to the *principal factor*, which he felt was "the best interest of the city," and that, additionally, consideration should be given to the intent of the charter provision with respect to the continuity and harmoniousness of the wards in any redistricting plan.

There is, of course, no language in the meager and limited directive to be found in the Charter to the effect that the principal factor to be considered in the redistricting of the city is what would be for the "best interest of the city," although we feel it goes without saying that even though not specifically spelled out in any part thereof, there is implicit in each and every section of the Home Rule Charter the intent that its provisions be carried out in the best interest of all of the *people* of New Orleans, and the *people* of each and every

one of these councilmanic districts, in order that they may receive, as nearly as possible, equal representation according to the population factor. In this light, under the plan as adopted in the ordinance under attack the people of District B, with a population of 138,699, are compelled to be treated as equal to and to be given equal representation with the people of District A, with a population of only 110,613.

There is also no language in the mandate for the redistricting of New Orleans that can be construed to contain the admonition or intent that consideration be given to the continuity and harmoniousness of the wards. However, we are not prepared to assert in this decision that the only test or standard to be applied in ascertaining the validity of such redistricting is the numerical equality between the districts, as contended by petitioners and intervenor, particularly in the light of the statement quoted above from the report of the advisory com-

---

**8.** It would appear from the excerpt of the minutes at which Ordinance 2234 was adopted several alternate plans were advanced, but they are not set out herein. In their pleadings petitioners called attention to two possible plans more numerically close, one of which is the primary plan recommended by the committee, and the other which reflects the city's division as follows:

| Councilmanic Districts | Wards | Population |
|---|---|---|
| A | 4, 5, 6, 16, 17 | 127,593 |
| B | 11, 12, 13, 14 | 127,136 |
| C | 1, 2, 3, 10, 15 | 122,659 |
| D | 7, 8 | 129,932 |
| E | 9 | 120,205 |

Under this plan it is obvious that the maximum difference in population between the largest (D) and the smallest (E) councilmanic districts is 9,727, and between the ideal factor of 125,505 and the largest, there is a difference of only 4,427.

mittee, composed of many of the members that drafted the Home Rule Charter, including Mr. McCall, who acted as chairman of both committees, and which is to the effect that although weight should be given to the charter provision with respect to the numerical equality between districts, they "should consist of wards which make up one solid and unbroken parcel" if possible. It is, of course, because Ward 15, with a population of 34,732 and lying on the west bank of the river,[9] cannot be made one solid and unbroken parcel with any other combination of wards that gives rise to difficulties, although it is obvious from the various other plans suggested, as referred to in this decision and its footnotes, that other combinations of wards may be so arranged as to result in a more equitable numerical division of the various councilmanic districts, and thus more nearly approximate the numerical equality between the districts intended by the plain language of Section 3–103(3) of Article III of the Home Rule Charter, under which Ordinance 2234 M.C. S. was adopted.

We think the following conclusion in Attorney General v. Suffolk County Apportionment Commissioners, 224 Mass. 598, 113 N.E. 581, 587, most appropriate here, and we quote from it thusly: "Even a cursory examination of the report would show that a far more equal apportionment might have been made by following the plain mandate of the Constitution. The conclusion is irresistible that the constitutional requirement of equality has been ignored. It is not open to reasonable controversy. Tried by the standard of equality of representation fixed by the Constitution, the result reached by the commissioners appears arbitrary * * *. They must make a determination of the nearest practicable approach to equality of representation."

The conclusion we have reached makes it unnecessary to consider the various authorities relied on by appellants, particularly since some do not involve redistricting or reapportionment legislative actions, and the provisions under which the redistricting was accomplished in others were entirely different and far more extensive and discretionary than those under which the redistricting of New Orleans is ordered by Article III, Section 3–103(3) of the Home Rule Charter.

▮ In oral and written argument in this court counsel for appellants have advanced the additional contention that inasmuch as petitioners did not pray to have the ordinance declared null, void, or unconstitu-

---

9. It is quite possible that with the present expansion occurring in Ward 15, and the large area there available for growth, the next decennial census will disclose this ward, like Ward 9, has grown sufficiently large to form a councilmanic district in itself.

tional, and the judgment does not so declare it, only restraining defendants "from acting pursuant to" the ordinance under attack, when actually there is nothing for the City or its Council to do thereunder, this court is without jurisdiction to entertain this appeal inasmuch as courts of equity will not require the doing of a vain and useless thing. In support of this contention reliance is placed on 30 C.J.S. Equity § 16, p. 336; Article 3605 of the Louisiana Code of Civil Procedure; and Schwegmann Brothers Super Market v. Hoffman-La Roche, 5 Cir., 221 F.2d 326, certiorari denied 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748.

This argument is untenable. While it is true the judgment granting the injunction does not in itself spell out the invalidity of the ordinance, it is stated therein appellants are being enjoined from taking any action pursuant to Ordinance 2234 M.C.S. "for the reasons this day dictated to the stenographer," in which reasons the judge holds the ordinance to be violative of the Home Rule Charter and of the Constitution of Louisiana. These reasons not only form the basis for the judgment, but must also be considered as written in to the judgment and form a part thereof.

For the reasons assigned, the judgment appealed from is affirmed.

134 So.2d 45

John Stanley DUMAS

v.

UNITED STATES FIDELITY & GUARANTY COMPANY.

Nos. 45480, 45488.

May 29, 1961.

On Rehearing Nov. 6, 1961.

